Filed 3/13/15

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| In re JESUS M., JR. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS M., SR.,<br><br>    Defendant and Appellant. | B256537<br>(Los Angeles County<br>Super. Ct. No. DK00871) |


        APPEAL from orders of the Superior Court of Los Angeles County, Stephen Marpet, Court Commissioner.  Reversed.

        Joseph D. Mackenzie, under appointment by the Court of Appeal, for Defendant and Appellant.

        Office of the County Counsel, Richard D. Weiss, acting County Counsel, Dawyn R. Harrison, Assistant County Counsel and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

Jesus M., Sr. (Father) challenges the juvenile court's order asserting jurisdiction over his two children, Jesus M., Jr. (Jesus) and Gissel M., under Welfare and Institutions Code section 300, subdivision (b), on the ground that substantial evidence did not support it.[1] We hold that the court's finding that Father's conduct -- harassing the children's mother in violation of a family law restraining order and denigrating the mother to the children -- placed the children at risk of emotional, but not physical injury, could not support assertion of jurisdiction under subdivision (b), which requires proof of physical harm or substantial risk of such harm. Accordingly, we reverse the court's jurisdictional order and the dispositional and custody orders that derived from it.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Family Law Proceedings*

Elda M. (Mother) and Father were married in 2000 and separated in 2009 or 2010.[2] Under a family law order, Mother had legal and physical custody of the children; Father had visitation three weekends per month. In June 2010, the family court issued a three-year restraining order, prohibiting Father from harassing Mother or contacting Mother except to facilitate visitation with the children, and requiring him to stay 100 yards away from her, her home, her workplace and her vehicle. In June 2013, Mother submitted a declaration in support of renewal of the restraining order. She stated that Father contacted her through calls and texts "every day," although she had changed her number several times to avoid him; followed her when she was driving; came to her house and tapped on the window on one occasion; waited outside her house on other occasions; harassed her when

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Mother is not a party to this appeal.

he saw her in the street; picked up the children without informing her; and denigrated her to the children.[3] The restraining order was renewed and made permanent in July 2013.

B. *Original Report and Detention Hearing*

Jesus and Gissel came to the attention of the Department of Children and Family Services (DCFS) in August 2013, when Jesus was 12 and Gissel was 10. DCFS received a report that Mother had left the children at home unsupervised on multiple occasions and allowed them to ride their bicycles around the neighborhood unsupervised. By the time of the referral, Mother and Father had been separated for more than three years. In interviewing Mother, the caseworker learned of domestic violence committed by Father prior to the separation. The caseworker also learned that Father had repeatedly violated the restraining order Mother had secured by leaving her inappropriate voice mails and texts and by coming within the proximity of Mother and her home. In addition, Father encouraged the children to question Mother about her conduct and report back to him, and induced Jesus to call her names. Mother said Father's violation of the restraining order was traumatizing to the children, especially when she called the police to report it. Mother reported that when they were together, Father was good to the children and did not mistreat them.

---

[3]     A police report from April 2013 stated that Father had come to Mother's house and knocked on her bedroom window. Mother also told officers she was receiving offensive text messages and voice mails on a daily basis. A police report from May 2013 stated that Father had arrived at Mother's home on a non-visitation day and demanded to see the children. He called several times after he left, issuing threats and stating he did not care about the restraining order. In June 2013, Father was charged with violation of Penal Code section 166, subdivision (a) (contempt of court). In February 2014, he pled guilty to a violation of Penal Code section 415, subdivision (2) (willfully and maliciously disturbing another) and was placed on probation for one year.

The children showed no signs of physical abuse, and denied that either parent abused them or made them feel unsafe. Gissel recalled Father throwing a telephone at Mother when they were living together, years earlier. Jesus did not recall observing any physical altercations between his parents, but did recall hearing Mother and Father argue and seeing pictures of injuries suffered by Mother.[4] Both children confirmed Mother's report that Father had violated the restraining order by coming around Mother's home. Gissel was undergoing therapy at the time. Gissel's therapist reported that she was "regressing" due to "all of the tension in the family." Jesus had been in therapy before, and his therapist confirmed that Father denigrated Mother to the children and interrogated the children about her actions.

Father was interviewed and reported that the children were often allowed to play outside unsupervised, and that he went by Mother's home to check up on them. He also stated he would take the children to a park if he saw them playing unsupervised and occasionally picked up his son at school to give him a ride home.

In September 2013, DCFS filed a petition alleging under section 300 subdivisions (a) (serious physical harm) and (b) (failure to protect) that the parents' "history of engaging in violent altercations, in the children's presence" endangered the children's "physical health and safety" and placed the children "at risk of physical harm, damage and danger." Referring to incidents that had occurred in 2010 and earlier, the petition alleged that Father "grabbed [Mother's] arm, inflicting marks and bruising," "grabbed [Mother's] head and moved [it] back and forth," "struck [Mother], inflicting a bleeding laceration to [her] lip[]," and "threw

---

[4]    A police report from 2010 stated that Father had grabbed Mother's face and arm, leaving a large bruise on her arm. The responding officer had taken photographs of Mother's injuries.

objects at [Mother]." The petition further alleged that "[o]n prior occasions, [Mother] threw objects at [Father]." The only factual allegation of recent conduct stated that in 2013, Father violated the restraining order. DCFS's detention report recommended that the children be detained from Father and that Father be restricted to monitored visitation. At the hearing on September 12, 2013, the court ordered Father to abide by the restraining order, but allowed the unmonitored visits to continue as permitted by the family law order.

B. *Jurisdictional and Dispositional Hearing*

Interviewed prior to the jurisdictional/dispositional hearing, the children described in greater detail the past incidents of domestic violence that had occurred when Mother and Father were together, more than three years earlier. They said that when such incidents occurred, they became scared and hid under their bed. Mother stated that Father had physically abused her throughout their relationship. In approximately 2005, Father participated in a domestic violence program, which improved his behavior for a period of time, but he physically abused her again on one occasion in 2010, shortly before she filed for divorce and obtained the original restraining order. Mother reported that the prior week, Father had followed her in his car while she was running an errand, and that her landlords had observed Father standing in front of her apartment. Although he had not recently attempted to physically harm her, she feared that he would.[5] In its jurisdictional/dispositional report, DCFS again recommended that the court restrict Father to monitored visits.

---

[5] Father did not make himself available to be interviewed by the caseworker.

In March 2014, DCFS filed a "last minute information" for the court renewing its request that the court detain the children from Father.[6] The caseworker stated that Father "does not respect boundaries and wants to continue controlling [Mother] through intimidation and harassment," and that he "repeatedly violated the restraining order by showing up at [Mother's] window and showing up in the laundr[omat] where [Mother] does her laundry." The court did not order the children detained, but instead instructed DCFS to set up a visitation schedule for Father that included unmonitored weekend visits.

In April 2014, DCFS again filed another last minute information for the court seeking restrictions on Father's visitation. This time DCFS stated that no one knew where Father was living or would be taking the children for visits, as he had not made himself available for an interview. It also stated that Father was sharing an apartment with an unknown male, and that the children and Father all slept in the same bed during visits.[7] The report attached letters from the children's therapists. Gissel's therapist reported that Gissel had made "little progress during the first two years of services," but had begun making progress recently, during the period Father was not visiting. Jesus's therapist stated that Jesus had "learned coping skills of emotional expression, seeking support, relaxation skills, problem

---

[6] The March hearing had been scheduled by Father's counsel to clarify Father's visitation rights. In November 2013, at a hearing to determine whether Mother could take the children to visit relatives in Mexico, the court had erroneously issued an order stating: "[Father's] visits remain monitored as previously ordered." At the March hearing, Father's counsel represented that Father had not been seeing the children because he had been informed he would have to pay for a monitor. DCFS's counsel confirmed that DCFS had been under the misimpression that Father could not visit without a monitor.

[7] As the report acknowledged, Father had not had any recent visits with the children. It later became clear that he had last visited sometime between September and November 2013. Consequently, the time period in which the described incidents occurred was not clear.

solving, and positive communication skills," and had "shown improvement in his functioning in social and family environments." The children told the caseworker they sometimes wanted to visit Father and sometimes did not, and reported that Father denigrated Mother to them. DCFS recommended that visitation be modified because "[Father] is not visiting with the children and the children are reporting feeling uncomfortable when they visit with him due to his negative feeling toward [Mother]" and because "his negative behavior and attitude toward [Mother] in front of the children is emotionally devastating to them."

At the hearing, counsel for the children stated they had had no recent contact with Father, but she supported DCFS's request for restricted visitation based on the "emotional abus[e]" of Mother, which counsel asserted was causing the children "secondary trauma." The court continued the hearing, instructing DCFS to file a comprehensive report explaining in detail the basis for recommending that Father's visitation be monitored.

In May 2014, DCFS filed a new detention report, a report under section 385, and two last minute informations for the court.[8] The reports stated that the need for detention was based on the past incidents of domestic violence, Father's repeated violations of the restraining order, his refusal to cooperate with DCFS, and a new report from Mother that Father had threatened to flee with the children to Mexico.[9] The report made clear that the information communicated by the children in April

---

[8] Section 385 provides that "[a]ny order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article."

[9] It is unclear when Father made this alleged statement or when Mother reported it, as the reports do not indicate that the caseworker conducted a new interview of Mother. All the other statements attributed to Mother in the reports appear to have been from interviews conducted prior to the original detention hearing in September 2013.

about Father's living arrangements referred to past visitations, and had since changed.

At the May 5, 2014 hearing, counsel for Father pointed out that the information in the new detention report was based primarily on old interviews, and that DCFS had provided no new information to support the requested change in visitation. Counsel for the children argued that the failure to detain the children from Father at that time had been an error, although no party had sought review. The court scheduled a trial on the issue of modifying the visitation order, and ordered Father's visits monitored in the interim.

At the May 19 and 20, 2014 hearings, a combined hearing on jurisdiction, disposition, and the request to modify the original "non-detention" order, Jesus testified that he would like to visit Father "sometimes" and was not afraid of him. Gissel similarly testified she would like to visit Father "sometimes." She said she was afraid of him when he got angry, but she denied he became angry during their visits. Mother testified to the specific incidents of domestic violence occurring during their relationship, viz., Father hitting her lip in 2005 and grabbing her arm and head in 2010.

The court sustained the allegations of the petition asserting that Father and Mother had a history of engaging in violent altercations in the children's presence, specifically, that Father had grabbed Mother's arm, inflicting marks and bruising, grabbed Mother's head, and lacerated her lip, and that the parents had thrown objects at each other. The court also sustained the allegation that in 2013, Father violated the restraining order put in place to protect Mother. The sustained allegations were those pled under section 300, subdivision (b), asserting that Father's conduct "endanger[ed] the children's physical health and safety" and "place[d] [them] at risk of physical harm, damage and danger." At the hearing, however, the court expressly found that "this is not a case of domestic violence

8

. . . [t]his is a case where there has been domestic violence in the past," resulting in the issuance of a permanent restraining order. The court found that as a result of Father's violations of the restraining order, "these children . . . have been injured emotionally, not physically, but emotionally."[10]

After making its jurisdictional findings under subdivision (b) of section 300, the court detained the children from Father and terminated jurisdiction, issuing a family law order granting sole legal and physical custody to Mother.[11] Father was permitted monitored visitation of two hours, twice per month.[12] Father appealed.


**DISCUSSION**

The court found jurisdiction appropriate under section 300, subdivision (b). Father contends substantial evidence did not support the court's jurisdictional finding. On this record, we must agree.

Section 300, subdivision (b) provides a basis for assertion of dependency jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." "'A jurisdictional finding under section 300, subdivision (b), requires: "'(1) neglectful

---

[10] The court dismissed the allegations pled under subdivision (a) (serious physical harm).

[11] When a juvenile court terminates jurisdiction over a dependent child, it is empowered by section 362.4 to make orders affecting custody and visitation known as a "family law," "exit" or "custody" orders, which become part of the family law proceeding and will remain in effect until they are terminated or modified by the family court. (*In re Chantal S*. (1996) 13 Cal.4th 196, 202-203; *In re T.H*. (2010) 190 Cal.App.4th 1119, 1122-1123; *In re John W*. (1996) 41 Cal.App.4th 961, 970.)

[12] The court also ordered Father to complete a 26-week domestic violence program for perpetrators and undergo individual counseling to address the effects of domestic violence on the family.

9

conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the child, or a "substantial risk" of such harm or illness.' [Citation.]" [Citations.]  The third element "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur)." [Citation.]'" (*In re A.G.* (2013) 220 Cal.App.4th 675, 683, quoting *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

As appellate courts have repeatedly stressed, "'[s]ubdivision (b) means what it says.  Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness.'" (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 823; accord, *In re John M.* (2013) 217 Cal.App.4th 410, 418; *In re Noe F.* (2013) 213 Cal.App.4th 358, 366; *In re David H.* (2008) 165 Cal.App.4th 1626, 1642; *In re Janet T.* (2001) 93 Cal.App.4th 377, 391.)  Nonetheless, we are repeatedly called on to review jurisdictional findings where, as here, one parent has behaved badly, undeniably causing family trauma, but presents no obvious threat to the children's physical safety.  There was evidence to suggest the children were suffering emotionally, but rather than allege emotional abuse under subdivision (c) of section 300, DCFS asserted jurisdiction under subdivision (b), presented vague evidence of emotional distress, and persuaded the court to assert jurisdiction in the absence of substantial evidence of a risk of serious physical harm.[13]  As the court

---

[13]     Subdivision (c) provides for assertion of jurisdiction where the child is suffering or at risk of suffering "emotional damage," but only if it is "serious" and "evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others."  (§ 300, subd. (c); see, e.g., *In re Daisy H.* (2011) 192 Cal.App.4th 713, 715, 717-718 [juvenile court's finding that children were at risk of "'emotional harm'" because father had choked and threatened to kill mother years before and had recently

*(Fn. continued on next page.)*

found, Father had committed acts of domestic abuse years ago, but thereafter restricted his misconduct to harassing Mother and denigrating her to the children. Accordingly, as the court recognized, the evidence supported "emotional[], not physical[]" injury. Subdivision (b) does not provide for jurisdiction based on "'emotional harm.'" (*In re Daisy H., supra,* 192 Cal.App.4th at p. 718.) Accordingly, the court could not properly assert jurisdiction over Jesus and Gissel under subdivision (b) of section 300.[14]

Respondent contends the subdivision (b) finding was supported by the evidence of domestic violence. Courts have held that "domestic violence in the same household where children are living . . . is a failure to protect [them] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; accord, *In re T.V.* (2013) 217 Cal.App.4th 126, 135; see *In re R.C.* (2012) 210 Cal.App.4th 930, 941-942 ["'Children can be "put in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg

---

made derogatory statements about mother to children, including calling her "'bitch, hoe [sic] and prostitute,'" held insufficient to establish jurisdiction under subdivision (c)]; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1377-1380 [evidence of conflict between parents causing child to suffer "upset, confusion and gastrointestinal distress" and to express "deep dislike and fear" of father, held insufficient to establish jurisdiction under subdivision (c) of section 300]; see *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1261-1263 [evidence that child who had no established relationship with father, experienced "anxiety" at the thought of living with him and suffered from "adjustment disorder" did not support juvenile court's finding that placing child with father would be detrimental].)

[14] DCFS's section 300 petition did not include an allegation under section 300, subdivision (c). Nor does it seek remand to assert and prove such an allegation. Neither DCFS nor the minors' counsel presented evidence to support "severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others" as required under subdivision (c), and DCFS does not argue on appeal that the evidence was sufficient to sustain such a finding had it been pled.

. . . ."""].) Here, the parents had long been separated, the two incidents Mother could recall had occurred more than three years earlier, and there was no evidence of current violent behavior. More important, the court expressly disavowed the incidents of domestic violence as a basis for assertion of jurisdiction, finding they had occurred "in the past," and that the current problem was Father's violation of the restraining order and its effect on the children. A reviewing court may not "consider whether there is evidence from which the dependency court could have drawn a different conclusion," but is limited to determining whether "there is substantial evidence to support the conclusion that the court did draw." (*In re Noe F.*, *supra*, 213 Cal.App.4th at p. 366.)

Respondent emphasizes that Father had a history of physical violence against Mother and a current pattern of harassing her in flagrant disregard of the restraining order. Reprehensible as such conduct was, it did not demonstrate a risk of physical harm to the children justifying the assertion of jurisdiction under subdivision (b) of section 300. Dependency proceedings are designed not to prosecute a parent or "for the reproof and improvement of erring parents," but to protect children. (*In re A.J.* (1969) 274 Cal.App.2d 199, 202; see *In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419.) The court expressly found that the injury, and by implication the risk of injury, to the children was "not physical[]."

To be sure, Father behaved in a way that was both illegal and detrimental to the emotional welfare of his children. Had DCFS believed Father's conduct posed a risk of inflicting severe emotional damage, its duty was to allege that in a petition asserting jurisdiction under subdivision (c) of section 300. It did not do so, the court made no findings under that subdivision, and respondent does not argue that the court's jurisdictional finding could be sustained on that basis.

Finally, we note that Mother was not without options other than resort to dependency proceedings. By the time of DCFS's intervention, she had already

12

obtained a permanent restraining order in family court and had sought police protection when Father violated it. Criminal proceedings had been instituted, and Father was on probation, facing a risk of incarceration should he violate the restraining order again. Mother also remained free to seek restrictions on Father's visitation in family court, which is authorized to limit a parent's visitation to monitored, or to prevent it entirely, upon a showing that "visitation would be detrimental to the best interest of the child." (Fam. Code, § 3100, subds. (a)-(b).) A juvenile court may not intervene, however, absent substantial evidence of at least a risk of physical injury or serious emotional harm to a minor. Neither was established by the evidence presented below. Accordingly, we must reverse the court's jurisdictional order. In the absence of jurisdiction, the court had no authority to issue a dispositional order or the family law custody order. (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1261; *In re R.M.* (2009) 175 Cal.App.4th 986, 991; see § 362.4.)

**DISPOSITION**

The May 20, 2014 jurisdictional and dispositional orders and the May 30, 2014 custody order are reversed.

**CERTIFIED FOR PUBLICATION**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

14