Filed 8/13/15  In re Amy T. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Amy T. et al., Persons Coming Under the Juvenile Court Law. | B259832 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>SANDRA P.,<br><br>        Defendant and Respondent;<br><br>AMY T. et al.,<br><br>        Respondents. | (Los Angeles County Super. Ct. No. DK05277) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Kim Nemoy and Lisa Huerta, Deputy County Counsel, for Plaintiff and Appellant.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Respondent Sandra P.

Michele Anne Cella, for Respondents Amy T. et al.

_____

The Department of Children and Family Services (DCFS) appeals from the order dismissing its petition alleging that Jonathan T. and his sister Amy T. were dependent children, due to non-accidental rib fractures suffered by infant Jonathan, while in the care of his parents, Sandra P. (mother) and Jonathan T. (father).[1] We conclude that substantial evidence supports the trial court's finding that DCFS failed to establish that the injuries were non-accidental or the result of parental neglect, and therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Jonathan is a medically fragile child. He was born prematurely, at only 29 weeks of gestation, at the end of January 2014. He remained at the hospital, in the neonatal intensive care unit, for two months. During this time, mother sat by his bedside every day. Before Jonathan was released home, doctors showed mother the correct way to hold him. Mother and father were required to take a CPR class, and watch a video teaching them not to shake the child. They were also permitted to stay overnight at the hospital with Jonathan, to learn what to expect when they brought him home.

When Jonathan was released at the end of March 2014, he had osteopenia, a calcium deficiency which caused his bones to be brittle and easier to break. He was to be given Vitamin D to help resolve the issue. He also had trouble breathing; he would frequently stop breathing for a few seconds and mother or father would have to gently tap him to make sure he restarted breathing. Mother brought him back to the hospital only one week after his release, because his breathing was getting worse. Jonathan was diagnosed with a viral infection, prescribed albuterol, and discharged home the same day.

Three weeks later, on April 30, 2014, mother again brought Jonathan back to the hospital, expressing further concerns regarding his breathing. That day, a chest x-ray was taken. The x-ray showed a "small right pleural effusion" – a fluid collection in the membrane around the lung – although no significance was attached to it at the time.

---

[1] Both the father and the child have the same name. We refer to the father as "father" and the child as "Jonathan."

Contemporaneous notes regarding the April 30 x-ray state, "Bones are intact." Jonathan remained in the hospital until May 2. He was released with a diagnosis of pneumonia.

Another three weeks passed, and mother returned to the hospital with Jonathan for his continued breathing difficulties. This time, an x-ray revealed fractures to Jonathan's ribs. Specifically, Jonathan had healing fractures to his lateral right third through tenth ribs, all in a row. The fractures were not new. They could not be definitively dated, but, due to the amount of healing, the fractures were determined to be at least two weeks old, and likely "several" weeks old. Given that the April 30 x-ray had been taken less than a month earlier, doctors reevaluated the findings from that x-ray. They concluded that the fractures might have been present but unseen on the x-ray, and that the pleural effusion "might have been a hematoma at the time of trauma."

Doctors suspected abuse, and a referral was made to DCFS. The doctors conducted further tests to determine whether medical causes (such as metabolic bone disease) could have been responsible for Jonathan's fractured ribs, and also to check for any other signs of injury. All tests were negative;[2] there was no available explanation for the fractures, but there were also no other signs of abuse. Specifically, there were no retinal hemorrhages, no bleeding to the brain, no bruising, and no other fractures.

Neither mother nor father had any explanation for Jonathan's rib fractures. They did not state that Jonathan had been involved in any sort of accident which might explain his broken ribs. Given the absence of any explanation for the injuries, and the doctors' belief that injuries of this type could not occur without substantial physical force, several doctors at the hospital inferred abuse. Dr. Rachael Krause said, "I believe someone is hurting this child." Dr. Aurora Chin concluded that the fractures "would likely have been intentional, as a simple sudden movement would not result in that type of fracture." Dr. Karen Keller diagnosed Jonathan with "non-accidental trauma." A child abuse referral

---

**2** Jonathan did have slightly insufficient Vitamin D levels; parents' medical expert would testify that this "means that his bones are perhaps a little more susceptible [to injury] although not significantly so."

was made by the hospital to DCFS; the referral stated that someone must have lifted the child and thrown him down hard to cause this injury.

Given this unanimous medical opinion, DCFS obtained an immediate order to detain Jonathan, as well as Amy, his 19-month-old sister. Jonathan was detained in the hospital; Amy was detained in the home of her maternal grandparents.

On May 30, 2014, DCFS filed its petition, alleging that Jonathan was described by Welfare and Institutions Code section 300, subdivisions (a) [physical abuse] and (b) [neglect], and that Amy was dependent under (a), (b) and (j) [sibling abuse].[3] DCFS alleged, under each subdivision, that (1) Jonathan had sustained rib fractures; (2) the fractures were "consistent with non-accidental inflicted trauma"; (3) the parents gave no explanation for how Jonathan had sustained the injuries; (4) the injuries are of such a nature that would not ordinarily occur except as the result of deliberate, unreasonable, and neglectful conduct of the parents; and (5) the deliberate, unreasonable and neglectful acts of the parents endanger the children's health and safety and place them at risk.

The case proceeded toward an adjudication hearing, which was ultimately held in October 2014. In the interim, Jonathan was released from the hospital and placed with his sister at their maternal grandparents' home.[4] Parents had been granted monitored visitation three times a week for three hours a day; they never missed a visit. DCFS interviewed several relatives with whom parents, Amy and Jonathan had lived. They all

---

**3** All undesignated statutory references are to the Welfare and Institutions Code. In its petition, DCFS also alleged that Jonathan was described by section 300, subdivision (e), which pertains to "severe physical abuse." The statute defines severe physical abuse as "any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death." (§ 300, subd. (e).) The dependency court would ultimately dismiss this allegation at the adjudication hearing, after DCFS's own expert answered "No," to DCFS's question, "If these injuries had been left untreated, would they have caused disability, disfigurement, or death?"

**4** Jonathan was initially released to the maternal grandparents on May 30. Maternal grandmother observed his breathing to be getting worse and took him to the emergency room. He remained hospitalized until June 1, when he was again released with a diagnosis of viral pneumonia.

indicated that mother, who had been Jonathan's primary caretaker, was a wonderful parent. They also agreed that neither parent was ever seen acting improperly with the children, either before or after the detention. Amy had initially been assessed by DCFS as neat, clean, well-adjusted, and happy at home. Having been separated from her parents' home, however, she began "having difficulties." She was referred for therapy to help her deal with "difficulties related to separating from the parents." Mother and father also completed parenting classes.

In short, by the time of the adjudication hearing, the sole evidence of parental abuse was the existence of Jonathan's unexplained rib fractures. Against this evidence was the unanimous opinion of everyone who had seen them interact that mother and father did not, and would not, harm their children. Mother never missed a doctor's appointment with Jonathan, and, in the two months that she had Jonathan in her custody, took him to the hospital three times with concerns for his health. She was always seen showing great care towards the fragile infant; and his toddler sister was happy and well-adjusted in her home as well. Hospital personnel and law enforcement agreed that parents' reactions on learning of Jonathan's fractures were appropriate, and the child had sustained no other injuries indicative of abuse.

Against this background, the adjudication hearing became a battle of the experts. Although mother and father each briefly testified, the main testimony at the hearing consisted of that of DCFS's expert, Dr. Sandra Murray, and parents' expert, Dr. Thomas Grogan.

Dr. Murray is an expert in Child Abuse Pediatrics. She testified that, based on the pleural effusion on the April 30 x-ray, it was likely that Jonathan's injuries had occurred around that time, although they could have occurred earlier. She could not, however, testify as to how long before the April 30 x-ray the injuries would have occurred, saying it could have been no more than a week. She testified that, in the absence of a history of accident, it was "most likely" that Jonathan's rib fractures were the result of "not accidental trauma." When cross-examined as to details, Dr. Murray stated that the fractures could have been caused by forceful compression or direct blows to the chest.

5

She believed that it was most likely front-to-back compression, although conceded it was possibly side-to-side compression. Dr. Murray stated that it takes "[l]ots of force" to break a child's ribs, such as forcibly squeezing the baby's chest or a direct blow that is similar in strength and force to an automobile accident. She testified that the necessary force is more force than generally happens "in any normal caregiving" or "common household accidents." On the issue of whether Jonathan's ribs could have been injured without parents' knowing, Dr. Murray had two opinions. First, she testified that it is often that rib fractures are not noticed. They are painful when they first occur, but not when they start healing. "And it's not uncommon for caregivers not to recognize that there are rib fractures." However, she also testified that the *mechanism* of a rib fracture in a 3-month-old premature infant would have to be recognized. A child that small cannot get up and walk away; if Jonathan fell, he would remain where he fell. Nor could he cause this type of injury to himself. Because of that, and the amount of force necessary to cause the injuries, Dr. Murray believed someone would have had to know that something had happened to cause Jonathan's injuries.

Dr. Grogan is an expert in Pediatric Orthopedic Surgery. He has studied the available literature regarding the pressure necessary to cause bone fractures, and has also worked in a "fracture lab," where he produced fractures with various types of force, to study the forces necessary to cause fractures and also to determine fracture patterns. He testified that the literature, as well as his clinical observations and work at the fracture lab, teaches that *lateral* rib fractures like Jonathan's are caused by a lateral compression of the chest – that is, from side-to-side, rather than front-to-back. Front-to-back compression causes a different fracture pattern. This is significant because it is front-to-back compression that is frequently associated with shaken babies. As the eight fractures perfectly line up, Jonathan's ribs were fractured by a flat force rather than a pointed one (that is, a compression rather than a punch). Given the size and pattern of the breaks, they could have been caused by flat force exerted by the palm of an adult's hand. Dr. Grogan also testified that, because Jonathan was premature, his ribcage at the time of the injury was physiologically the same as that of a newborn, which would require less force

6

to cause a fracture. Considering Jonathan's size, the fractures would have been caused by 40 to 50 Newtons of force, which is about what is necessary to break a pencil. Dr. Grogan concluded the fractures could have been caused intentionally or accidentally. He stated, "I think it's by someone who is unskilled or ignorant of the amount of force applied to a child of this size." Dr. Grogan suspected someone might have picked up Jonathan by placing his hand under Jonathan's armpit. Jonathan's neck would have been very unstable, and the person "probably squeezed harder in order to stabilize him in lifting, and that force of squeezing from side to side is what caused this fracture line to occur." Dr. Grogan agreed with Dr. Murray that the baby would have cried but would have been "very, very quickly consolable," and that it is not at all unusual that parents are unaware of such an injury. Indeed, he testified that it was common that parents did not realize that an injury has been caused in a similar fashion. Dr. Grogan agreed that the injury probably occurred around April 30.

While the court found both experts credible, it believed Dr. Grogan's expertise in orthopedics was more relevant. The court turned to the allegations of the petition and concluded that it could *not* find that Jonathan's injuries were of such a nature that would ordinarily not occur except as a result of deliberate, unreasonable or neglectful acts of mother and father. The court was persuaded by Dr. Grogan's testimony that a parent could have caused these injuries without knowing about it. The court specifically concluded that the Department had not established that the injuries were "nonaccidental." The court therefore dismissed the petition with prejudice and released Jonathan and Amy to their parents.

DCFS filed a timely notice of appeal. DCFS also filed a petition for writ of supersedeas, seeking to stay the court's order dismissing the petition and to order the children re-detained pending appeal. We granted the petition in part, staying the dismissal, but declined to order the children re-detained.

7

**DISCUSSION**

*1. Standard of Review*

When the trier of fact has found that the party with the burden of proof has failed to carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) Where the issue on appeal turns on a failure of proof at trial, the question is simply "whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Ibid.*)

*2. The Section 355.1 Presumption*

Preliminarily, DCFS argues that "there is a presumption that a child, like Jonathan, is subject to the jurisdiction of the juvenile court" under section 355.1. Section 355.1, subdivision (a) provides that "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300."[5] The section 355.1 presumption applies only "*[w]here the court finds*, based upon competent professional evidence" that the child's injury is of a nature as would not ordinarily occur without unreasonable or neglectful acts of the parent. (Emphasis added.) When the court does not make the finding, the presumption does not come into play. (*In re Sheila B.* (1993)

---

[5]     DCFS is required to give notice to parents if it chooses to rely on this presumption. This can be satisfied by the language of the petition itself, if the petition borrows the language of the section 355.1 presumption. (*In re D.P.* (2014) 225 Cal.App.4th 898, 904.) DCFS chose to follow this course in its petition in this case.

19 Cal.App.4th 187, 200, fn. 7.) As the dependency court expressly refused to make this finding, the section 355.1 presumption is simply inapplicable to this case.

3.	*Insufficient Evidence that Jonathan is Necessarily Described by Section 300, Subdivision (a)*

A child is described by section 300, subdivision (a) when the child "has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." DCFS argues that the dependency court applied the wrong standard, in that the court focused on whether Jonathan's injuries were inflicted *intentionally* rather than whether they were inflicted *nonaccidentally*. Assuming, without deciding, that these terms do, in fact, mean different things, the court expressly found that it could not infer from the evidence "that the injuries were nonaccidental." The court used the precise language of the statute; it did not use the wrong standard.

Moreover, it is clear that DCFS did not establish that parents "nonaccidentally" inflicted Jonathan's rib injuries as a matter of law. Dr. Grogan specifically testified that such injuries could have been inflicted accidentally by someone lifting the child by the armpit and applying too much pressure in an effort to stabilize him.

4.	*Insufficient Evidence that Jonathan is Necessarily Described by Section 300, Subdivision (b)*

A child is described by section 300, subdivision (b) when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his . . . parent or guardian to adequately supervise or protect [him]." This requires: (1) neglectful conduct by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of such harm or illness. (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.) The court expressly found that DCFS did not establish that the injury was the result of a "neglectful act."

9

It is clear that DCFS did not establish that the injury was the result of a neglectful act as a matter of law. Dr. Grogan testified the injuries could have been inflicted accidentally, and an accident is not necessarily the result of neglect. (*In re A.S.* (2011) 202 Cal.App.4th 237, 246.) DCFS argues that, even accepting Dr. Grogan's testimony, parents *must have known* Jonathan suffered the rib injuries. DCFS notes that Dr. Grogan stated the necessary force was akin to that necessary to break a pencil, and DCFS infers that this "is enough force to be noticeable." DCFS then concludes that parents either caused the injuries or knew how they occurred. But DCFS's inference that the force is sufficient to be noticeable was entirely contradicted by the testimony at trial. Not only did Dr. Grogan testify that it was common that parents are unaware of this type of injury, Dr. Murray agreed, stating that it is often that rib fractures are not noticed.

As a final argument, DCFS relies on a theory of res ipsa loquitur, reasoning that since Jonathan was never outside of his parents care, they must have either caused the injuries or reasonably should have known how he sustained them.[6] (See *In re E. H.*(2003) 108 Cal.App.4th 659, 669-670.) But this inference is only appropriate when, in fact, there was some visible or other evidence of injury which would provide a basis to infer that the parents should have known the child was injured. (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1254-1255.) Here, that evidence was lacking. Not only did the experts agree that parents might miss rib fractures of this type, the evidence is undisputed that the medical professionals at the hospital also failed to notice the rib fractures at the April 30, 2014 admission, even though the fractures were fairly recent and the hospital possessed the additional x-ray evidence of the pleural effusion. Dr. Murray testified that it was not likely there was bruising at the time of the injury, and Dr. Grogan testified that

---

**6** We note, in this context, that even though mother and father testified Jonathan was never out of their care, there were numerous other adults who had access to the child. At times, mother and the children lived with Jonathan's maternal grandparents. Mother's adult brother and her 15-year-old sister also lived in that home. At other times, mother and Jonathan lived with father, father's mother, and father's grandmother. The hospital notes from the April 30 admission indicate that, at that time, mother and the children lived with "a friend," who was otherwise unidentified.

although Jonathan would have cried at the time of the injury, he would have been very quickly consolable.  In short, DCFS failed to establish that, as a matter of law, there was sufficient evidence from which it could be inferred that parents reasonably should have known of Jonathan's rib fractures.

## DISPOSITION

The November 12, 2014 stay of the dismissal is hereby dissolved.  The judgment of dismissal is affirmed.


RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.


GRIMES, J.

11