Filed 4/27/16  In re T.L. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

|  |  |
|---|---|
| In re T.L. et al., Persons Coming Under the Juvenile Court Law. | B266130 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.G.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK07393) |

APPEAL from orders of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirm.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

S.G. (mother) appeals the juvenile court's jurisdictional and dispositional orders regarding her daughters T.L. and A.L. She argues that her engaging in acts of prostitution did not support the assertion of jurisdiction and removal of the children from her custody because it did not expose the children to risk of physical harm. (Welf. & Inst. Code, §§ 300, subd. (b); 361, subds. (c) & (d).)[1] We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

In September 2014, the vice detail of the Long Beach Police Department responded to an ad on a website known for advertising prostitution services and arrested mother and an unrelated minor, A.F., for engaging in prostitution in a hotel room. Two men were arrested outside the hotel. One of them, M.G., was in a car with T.L. (born 2010) and A.L. (born 2012). The Department of Children and Family Services (DCFS) took the children into protective custody and filed a section 300 petition on their behalf.

In his interview with police, M.G. at first claimed the children were his and their mother lived out of state, but he later admitted the children were mother's. Mother identified M.G. as her boyfriend but maintained he was not her pimp, even though he had reserved hotel rooms and posted ads for her services online. In mother's phone, M.G.'s contact information appeared under the name "My King." According to mother, the two had brought T.L. and A.L. from Sacramento to Disneyland, and M.G. looked after the children while mother prostituted herself on the trip. Mother admitted to working as a prostitute since she was 17 years old, but insisted she did not know A.F. was underage.[2]

The children's maternal grandmother and aunt told DCFS that they cared for the children when mother worked as a prostitute in Sacramento. The children's father, who lived out of state, claimed neighbors had told him that mother "got dudes running in and out of the house." The older of the girls, T.L., stated that whenever mother "[w]ork[ed]

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] Mother's criminal record included prior arrests for prostitution, pimping, and human trafficking of minors, as well as pandering and prostitution convictions.

in the room," she had to leave. T.L. was assessed as presenting with sexualized and aggressive behavior, using profanity, and pulling out her eyebrows as an anxiety response. Further assessment was needed to determine the source of these behaviors, but they could be attributed to "trauma exposure." The younger girl, A.L., was speech delayed and often rocked her body.

The children were initially placed in foster care, but before the jurisdictional hearing in February 2015 they were placed with the maternal grandparents. At the hearing, the court sustained mother's section 355 hearsay objections to statements made by minor A.F. and the man A.F. claimed was her pimp, but overruled the objections to mother's own statements and phone messages. The court dismissed counts b-1 and d-1, both of which were based on mother's alleged commercial exploitation of A.F., finding insufficient evidence that mother knew A.F. was a minor. The court sustained the allegations in count b-2 that mother placed the children at risk of physical harm and sexual abuse because she engaged in prostitution while the children were in her care; the identical allegations in count d-2 were dismissed.

The court rejected mother's assertion that she never engaged in prostitution in the children's presence, stating: "Certainly, the children have been in your care at the time that it happened. They might not be in the bed, they might not be in the room, but they are certainly in your care at the time." The court referenced T.L.'s statement that she had to leave the room when mother worked as evidence that the children "have been in the home when this has happened." The court also found the children were in mother's care on the day of her arrest, even though they were with M.G., and that M.G. had arranged for the room where the act of prostitution took place. The court observed that "children and prostitution do not mix," and taking time off to engage in prostitution on the way to Disneyland was not appropriate parenting. The court concluded that the closeness of the children to acts of prostitution could place them in danger from people participating in those acts, in addition to the children's awareness of and possible ability to see some of what went on.

Mother's first criminal case ended in a mistrial but she remained in custody at the time of the dispositional hearing in May 2015, and she submitted proof of having attended various programs while incarcerated. There was evidence the children had improved while in therapy and in the grandmother's care. The court was pleased with mother's progress towards reunification, but denied her request for a home-of-parent (mother) order, finding clear and convincing evidence of a substantial danger to the children's physical health or emotional well-being if they were returned to her custody and no reasonable means of protecting them without removal. The court also declined to release the children to their father. The parents were ordered to receive reunification services.

Mother timely appealed.

## DISCUSSION

Section 300, subdivision (b) brings a child within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." Subdivision (c) in turn provides for jurisdiction over a child who is "suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ." DCFS opted to base its allegations in this case on subdivision (b) rather than subdivision (c). Mother argues that there is no substantial evidence of a risk of physical harm to the girls as, at most, they showed signs of emotional trauma.

Mother relies on cases that have held that a parent's substance abuse or mental problems are not, by themselves, evidence of unfitness. (See e.g. *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003; *In re David M.* (2005) 134 Cal.App.4th 822.) Those cases are inapposite since mother is not a parent who sporadically uses drugs or has psychological issues with no apparent effect on her ability to care for her children. Even

4

in cases of parents who use drugs or have mental health problems, courts are more likely to find an inherent risk to the physical health and safety of children of "tender years," who cannot protect themselves. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1220.)

Mother also relies on *In re Jesus M.* (2015) 235 Cal.App.4th 104, 107, where the children's father was violating a restraining order to harass the mother, and that was upsetting the children. We acknowledged that domestic violence "is a failure to protect [children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. [Citations.]" (*Id.* at p. 112.) But the evidence of domestic violence in that case was stale, and the juvenile court had expressly declined to assert jurisdiction based on it, limiting its concern solely to the father's violation of the restraining order and its effect on the children's emotional welfare. (*Id.* at p. 113.) That concern, we concluded, was insufficient to support jurisdiction under section 300, subdivision (b).

Mother's case cannot be discounted as a case of simply upsetting the children. As DCFS points out, mother's decision to engage in prostitution while on the road with her young daughters (ages two and less than four at the time) placed the girls in the midst of an undercover police investigation. Both mother and M.G., in whose immediate care the children were found, were arrested, and DCFS had to take the children into protective custody. While the children may not have been in the hotel room with mother, neither were they in a safe environment or under appropriate supervision, as their immediate caretaker, M.G., was apparently implicated in reserving the hotel room and placing prostitution ads on mother's behalf.

The day of the arrest does not appear to be an isolated incident of poor judgment on mother's behalf. Her interview with police, objections to which the juvenile court overruled, indicates that mother engaged in prostitution on the road on more than one occasion, and that A.F. and her alleged pimp spent a night at mother's hotel room waiting for potential clients to respond to online ads. As DCFS notes, the children must have been in the room at the time, and T.L.'s statements confirm she must have been in close

5

proximity since she would have to leave the room where mother "worked." Nor is it necessarily clear that mother always arranges for the children to be with the grandmother when she works as a prostitute in Sacramento. Mother did not object to the father's claims that towards the end of their relationship he felt uncomfortable leaving the children in mother's care and had since heard that there were "dudes running in and out of the house."

It is not speculative to conclude that having children in such close proximity to prostitution activity exposes them to physical danger in addition to emotional trauma, as the dangers of prostitution have been widely reported. (See, e.g., Farley, *Prostitution, Trafficking, and Cultural Amnesia: What We Must Not Know in Order to Keep the Business of Sexual Exploitation Running Smoothly* (2006) 18 Yale J.L. & Feminism 109, 113 ["Sexual violence and physical assault are the norm for women in all types of prostitution"].) The court need not wait until a child is seriously abused or injured to assume jurisdiction. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

"Before the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the child cannot safely remain in the home. [Citation.] The parent need not be dangerous and the child need not have been actually harmed before removal is appropriate. [Citation.] We review the court's dispositional order for substantial evidence. [Citation.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.)

As we discussed, mother showed a pattern of placing the children at substantial risk of physical harm by engaging in prostitution while they were in close proximity and in the care of an individual implicated in mother's prostitution activity. Mother had been a prostitute for 17 years, and had repeatedly engaged in criminal activity; the concern that she might revert to her old ways if released was not unreasonable. Although she was taking classes and making progress while in custody, it is unclear to what extent those programs covered issues of prostitution and sexual trafficking.

Mother attempts to analogize her case to *In re Ashly F.* (2014) 225 Cal.App.4th 803, where a dispositional order removing the children from their home was reversed for lack of reasonable efforts to prevent removal. In that case, there was the option of removing the mother, who had inappropriately disciplined the children, and leaving the children with the father. (*Id.* at p. 809–810.) It is unclear what reasonable alternatives mother suggests DCFS should have considered in her case. The children already were in the care of the maternal grandmother, and mother was incarcerated. A home-of-parent order in that situation would have made no practical difference. Similarly, the removal order would make a difference only if mother is released, and since father lives out of state, the removal of the children from mother's custody cannot be accomplished without removing them from her home.

## DISPOSITION

The orders are affirmed.

**NOW TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

COLLINS, J.