Filed 7/9/21  In re N.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.T., a Person Coming Under the Juvenile Court Law. | D078590 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>T.T.,<br><br>    Defendant and Appellant. | (Super. Ct. No. J520616) |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court declared 21-month-old N.T. a dependent of the court and ordered him removed from parental custody after he ingested fentanyl

while in his father's care and had to be resuscitated at a hospital. N.T.'s father (Father) challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional findings and disposition. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 31, 2020, the San Diego Health and Human Services Agency (Agency) filed a dependency petition under Welfare and Institutions Code section 300, subdivision (b)(1),[1] concerning N.T. The Agency alleged that on December 9, 2020, 21-month-old N.T. ingested fentanyl, stopped breathing, lost consciousness, and was rushed to the emergency room, where he was administered Narcan. The Agency further alleged Father "denied having fentanyl in the home, and the mother has a documented history of substance abuse."

### Detention

On December 9, 2020, the Agency received an emergency report stating N.T. had been rushed to the hospital after going into respiratory distress. Hospital staff administered Narcan, which "is typically used for opiates and overdoses," and N.T. regained consciousness. Lab test results showed N.T. tested positive for fentanyl.

A social worker spoke with Father the day of the incident. Father reported that he and N.T. had gone outside to feed the rabbits, and then came back inside, where Father put N.T. in bed and gave him a bottle of milk from which N.T. had been drinking earlier that morning. N.T. started turning purple and his eyes rolled back in his head. Father screamed for help, and his wife (N.T.'s stepmother (Stepmother)) called 911. Paramedics responded and transported N.T. to the hospital.

---

[1]     Further statutory references are to the Welfare and Institutions Code.

Father denied knowing what fentanyl is. He also denied that he or anyone else in the home uses drugs. When a social worker asked Father how he thought N.T. could have accessed fentanyl, Father said "he must have picked it up while they were in the yard" because "people walk through his yard 'all the time.' "

Stepmother told a social worker she does not use any drugs other than marijuana, and that she has no knowledge of Father using any drugs or of other children in the home (two teenagers) using drugs or bringing them into the home.

N.T.'s mother (Mother), who did not have legal or physical custody of him, told a social worker that Father sells fentanyl pills, cocaine, and " 'a white pill that is also an opiate.' "[2] She stated that he keeps the drugs locked in his closet and she has never seen him leave anything lying around. Mother reported that the last time she saw Father sell drugs was December 1 (just over one week before the incident) when he was taking her to the airport. Mother also reported that Stepmother uses cocaine, which she buys from Father. Mother acknowledged her own history of using methamphetamine and cocaine—N.T. tested positive for cocaine at birth— but stated she had been clean for one year.

Father was initially uncooperative with the Agency, telling a social worker that " 'accidents happen' " However, Father ultimately cooperated, and N.T. was placed with S.J., the mother of Father's five-year-old daughter. The Agency opposed placing N.T. with Mother due to her history of substance abuse and erratic behavior. After S.J. told the Agency that Mother was harassing her, N.T. was placed with his paternal aunt (Aunt).

---

[2] The Agency's detention report summarized an inconclusive October 10, 2019 referral for "General Neglect" during which Mother reported to the Agency "that [Father] is a drug dealer who keeps his drugs in the home."

Aunt was " 'shocked' " to learn the allegations of the petition because Father "is an excellent father" and Aunt had "never had any concerns for [him] using or selling drugs."

Father, Stepmother, and Mother all submitted to drug testing at the Agency's request. Father's and Mother's results came back negative, while Stepmother's came back positive for cocaine.

A doctor with expertise in assessing child abuse told a social worker that "a child can become symptomatic from ingestion of fentanyl within a few minutes," and that even "really small amounts . . . can cause symptoms in a young child." She characterized N.T.'s experience as " 'a near-fatality.' " The doctor opined rabbit food could not have caused N.T. to test positive for fentanyl.

A child abuse detective told the Agency that police officers who searched Father's house after the incident found no drugs. They took N.T.'s baby bottle for testing, but results were not available before the detention hearing.

On January 4, 2021, the juvenile court made a prima facie finding on the petition, ordered N.T. detained from his parents, and directed the Agency to provide reunification services to the parents.

## Jurisdiction/Disposition

*Initial Report*

In its January 26, 2021 jurisdiction/disposition report, the Agency reported that N.T. remained detained with Aunt, who was meeting his needs.

Mother told an Agency social worker in a January 2021 interview that she was in Florida when the incident occurred, so she was "not exactly sure what happened." However, Mother stated she had seen Father "with [f]entanyl, as he sells the pills out of his home," and she thought "that the

4

pills may have accidentally been left out and that could be how [N.T.] ingested them." Mother again tested negative for all drugs.

Father told an Agency social worker in a January 2021 interview that he was still "not sure how" N.T. ingested the fentanyl. Father denied having fentanyl (or other drugs or alcohol) in his house, and further denied using such substances. He stated that Stepmother "does hair at home sometimes, and he did not know if some of her product dropped and got on the floor."

The child abuse detective reported to the Agency that "due to lack of evidence she could not continue with the investigation." The detective noted Father tested negative for drugs and did not have a criminal history involving drug offenses. The detective "had some concerns regarding" Mother, but "did not have enough evidence to pursue anything further."

The Agency viewed Father and Mother as "cooperative," and that Father "genuinely appeared upset over the incident." However, whereas Mother was receptive to seeing a substance abuse specialist, Father "was hesitant" and said he would first have to speak with his lawyer. Father had not updated the social worker by the time the Agency filed its report.

The Agency recommended that the juvenile court declare N.T. a dependent, stating: "This was a very serious incident and it is still unclear how [N.T.] ingested the fentanyl. Despite [Father] not having criminal history related to drugs it is concerning the incident happened in his home, and he cannot explain why or how. [¶] . . . [¶] It may never be known [to] whom the [f]entanyl belonged . . . ; however, it remains of serious concern to the Agency as the results could have been more severe or fatal."

*Addendum Reports*

In February 2021 addendum reports, the Agency advised that Father had again tested negative for all drugs. A social worker attempted to call

5

Stepmother to investigate whether the hair products she used contain fentanyl. However, the phone number that Father had provided to the Agency "was not a working number." Police informed the Agency that lab results on N.T.'s baby bottle still were not available.

The Agency also summarized conversations a social worker had with Mother regarding her claim Father sold fentanyl: "[M]other explained she used to live in the home up until she went to Florida, and she saw [Father] with pills and he would keep them in a locked box in his bedroom. [Mother] explained the pills were in a prescription type bottle, but she never saw a label describing the pills itself. . . . [P]eople would come in and out of the house to buy the pills and she would be in the car with [Father] at times when he would sell the pills."

Aunt told a social worker that "things were going well" with N.T., except that he "gets angry when [Father] leaves after his visits, because he wants to go with [Father] and does not understand why he cannot."

The Agency reported that both parents remained cooperative and were open to participating in services. However, the Agency was "still concern[ed]" about placing N.T. with Father because this "near fatal[ ]" incident occurred while N.T. was in Father's care.

The Agency reported that an unannounced visit to Father's home yielded no evidence of drugs, other than "a small bong . . . in the hall closet." Father claimed it belonged to "the other mother" (meaning Stepmother) and that he did not know it was there. He said he would throw it away.

At the February 10, 2021 jurisdiction/disposition hearing, a social worker testified that although she "never had any concerns" about Father being under the influence, her "main concern" was that the fentanyl incident occurred while N.T. was in Father's care "[a]nd there's still no explanation as

to where the fentanyl came from." She had "never known [fentanyl] to be in hair products." The Agency still had not received lab results from testing on N.T.'s baby bottle.

The social worker also testified that a police detective expressed "some question" about whether "there was any truth" to Mother's claim that Father sold drugs.

*Rulings*

The juvenile court found the petition's allegations true by clear and convincing evidence.

The court found it "uncontroverted" that N.T. ingested fentanyl while under Father's care at his home. The court rejected as "not credible" Father's claim that he did not know what fentanyl is—"the atomic bomb of drugs." And the court found "implausible" his suggestions that the fentanyl came from rabbit food or hair products. The court noted Mother's accusation that Father deals drugs.

The court further stated that while there was evidence suggesting Father does not use drugs, "there is evidence that the women in his life do," which "puts [N.T.] at risk."

The court ultimately found these considerations indicated a "lack of insight" by Father, who had not yet fully availed himself of the services the Agency offered him.

The court declared N.T. a dependent of the court, ordered him removed from his parents' custody, and directed the Agency to provide reunification services to the parents.

## DISCUSSION

Father contends insufficient evidence supports the juvenile court's jurisdictional findings and disposition. We disagree.

7

## I. Legal Principles

Under section 300, subdivision (b)(1), a child may be "adjudge[d] . . . to be a dependent child of the court" if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§300, subd. (b)(1); see *In re R.T.* (2017) 3 Cal.5th 622, 626.)

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; see *In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.) "The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present circumstances," taking into "consider[ation] the nature of the conduct and all surrounding circumstances," including "the present circumstances." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026; see *In re T.V.*, at p. 133 ["A parent's past conduct is a good predictor of future behavior."].) Simply put, the court " 'need not wait until a child is seriously abused or injured to assume jurisdiction.' " (*In re T.V.*, at p. 133.)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the

8

province of the trial court.' " (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) "The burden of proof for jurisdictional findings is preponderance of the evidence; for removal, it is clear and convincing evidence." (*In re E.E.* (2020) 49 Cal.App.5th 195, 205-206; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].)

## II. Analysis

Substantial evidence supports the juvenile court's jurisdictional findings and disposition. As the court observed, it is "uncontroverted" that N.T. ingested fentanyl—"the atomic bomb of drugs"—while in Father's care about two months before the court asserted jurisdiction over N.T. The record supports the court's finding that N.T. remained at substantial risk of suffering serious physical harm from being exposed to fentanyl.

First, the juvenile court's findings that Father was not credible in several respects support the court's jurisdictional findings. The court expressly rejected as "not credible" Father's claim to not know what fentanyl is. "In the midst of today's opioid epidemic it is common knowledge that fentanyl is particularly deadly." (*Commonwealth v. Burton* (Pa. Super. Ct. 2020) 234 A.3d 824, 833.) The court also found "implausible" Father's suggestion that the fentanyl came from rabbit food or hair products. A doctor who specializes in assessing child abuse advised the Agency that rabbit food could not have caused N.T. to test positive for fentanyl. And a social worker reported she has "never known [fentanyl] to be in hair products." Further, Father stymied the social worker's ability to investigate the hair product

9

theory by providing an invalid phone number for Stepmother (i.e., Father's own wife).

Second, substantial evidence supports that Father was the source of the fentanyl that N.T. ingested. Mother repeatedly asserted that Father sold drugs, including fentanyl. She reported this to the Agency months before the dependency case ever began; again in connection with the detention hearing; and again in connection with the jurisdiction/disposition hearing. Although a detective reportedly had doubts about the veracity of Mother's claim, we construe the record in the light most favorable to the juvenile court's rulings (*In re R.T.*, *supra*, 3 Cal.5th at p. 633), and "do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts" (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 135).

Finally, substantial evidence supports the finding that Father lacked insight into the fact that other members of his household might have exposed N.T. to the fentanyl he ingested. Stepmother denied using drugs (other than marijuana), but tested positive for cocaine during the dependency case. And the Agency's unannounced search of Father's home yielded a bong, which Father disclaimed knowledge of and attributed to Stepmother.

Given the serious physical harm N.T. already suffered in Father's home, under circumstances that remained largely unchanged as of the jurisdiction/disposition hearing, substantial evidence supports the juvenile court's jurisdictional findings. (See *In re J.N.*, *supra*, 181 Cal.App.4th at p. 1026.)

Contrary to Father's claim, the juvenile court did not improperly shift the burden to him to disprove the Agency's case. Rather, the evidence discussed above shows that the Agency met its evidentiary burden. It was

10

thus incumbent upon Father to rebut this evidentiary showing.  The court had a reasonable basis to find he failed to do so.

Nor, as Father claims, did the juvenile court base its findings on a single, past incident that was unlikely to reoccur.  As noted above, the circumstances under which N.T. suffered serious physical harm remained essentially unchanged.  Thus, he *remained* at substantial risk of again suffering serious physical harm.  (See *In re J.N.*, *supra*, 181 Cal.App.4th at p. 1026.)

Accordingly, Father's challenge to the juvenile court's jurisdictional findings fails.  And because his challenge to the court's dispositional order is based entirely on his claim regarding the lack of evidentiary support for the jurisdictional findings, his challenge to the dispositional order likewise fails.

## DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

11