Filed 8/31/16  In re Joshua N. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JOSHUA N., et al., Persons Coming Under the Juvenile Court Law. | B265797 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent. v. PAMELA B., Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK61398) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Marguerite D. Downing, Judge.  Affirmed and remanded with instructions.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Aileen Wong, Deputy County Counsel for Plaintiff and Respondent.

Merrill Lee Tool, under appointment by the Court of Appeal, for Minors.

Pamela B. (mother) appeals from a judgment of the juvenile court assuming jurisdiction over her children Joshua N. (born Mar. 2002) and Nylah N. (born June 2003). Mother challenges the juvenile court's decision that jurisdiction was warranted under Welfare & Institutions Code section 300.[1]  Mother also challenges the juvenile court's finding that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) is inapplicable.

The parties agree that the notice requirements of ICWA were not met in this case. Therefore, we remand the matter to the juvenile court for the limited purpose of compliance with the ICWA notice requirements.  We otherwise affirm the juvenile court's judgment.

## BACKGROUND

The family consists of mother, Timothy N. (father), and the children, Joshua and Nylah.[2]

**Petition and detention report**

On January 6, 2015, the Department of Children and Family Services (DCFS) filed a petition and detention report regarding Joshua and Nylah.  The petition alleged, under section 300, subdivisions (a) and (b), that mother had a history of violent and assaultive behavior, and that she had engaged in a violent altercation with a non-related adult female in the presence of the children.  Mother had instructed Joshua to intervene in the altercation.  The petition alleged that mother's violent and assaultive behaviors endangered the children's physical health and safety and placed them at risk of harm.

The events leading up to the filing of the petition began on November 26, 2014. DCFS received a referral alleging that mother had been arrested after a fight between mother and an non-related adult, Alicia.  Alicia sustained marks to her shoulder,

---

[1]      All further statutory references are to the Welfare & Institutions Code unless otherwise noted.

[2]      Father is not a party to this appeal.  At the time of the relevant events, father was living separately from mother and the children.

forehead, and back, although mother did not receive any marks as a result of the conflict. The children were left in the care of mother's adult daughter, Natasha B.

When a social worker appeared at mother's home on December 4, 2014, mother refused to allow the social worker inside the home. Mother claimed the problem was with Alicia and not her, and told the social worker never to return to her home. When Nylah came to the door, mother introduced Nylah to the social worker. Mother went on to express that Nylah was on the honor roll and had perfect attendance at school. Mother claimed to take good care of her children, that her son Joshua was autistic, but doing so well that he was being mainstreamed in school. Mother suggested that the social worker call the school to inquire about mother's parenting, and added that she and her children were victims in the situation with Alicia.

Mother explained that the incident occurred at the home of mother's godmother, Teresa.[3] Mother's adult daughter, Natasha, lived with Teresa. Alicia is Teresa's daughter and had recently moved in with Teresa as well. Mother telephoned Teresa and informed her that the social worker was at her home. Teresa requested that the social worker come to her home to discuss the incident.

Mother then told the social worker about the events of November 26, 2014. It was the day before Thanksgiving and mother and Teresa had returned to Teresa's home after getting some groceries. At that time, Teresa's home had not had running water for over a month. When they returned from getting groceries, mother went inside Teresa's home where she found feces piled up in Natasha's bathroom because they could not flush the toilet. Mother wanted to help Natasha find something to use to flush the toilet. Mother said Alicia assumed mother was coming to Teresa's house to say something about the situation, and they began to argue. Mother reported that Alicia is a 300 lb. woman who just jumped on her out of nowhere. Though Alicia blocked her in, she freed herself, grabbed her children and left. The police later came to mother's door and arrested her.

---

[3] Teresa is sometimes referred to in the record as Leomise or Teresa Leomise. For consistency, she will be referred to as Teresa throughout this opinion.

They also handcuffed her children and put them in the police car. Mother said the social worker should be investigating Alicia and her children.

Mother stated she was incarcerated as a result of the incident and had to post $3,000 bail. Mother also does not want DCFS around because she never had a good relationship with them. DCFS falsely accused her children's father of sexual assault and it took her six months before she got a letter of apology from the regional director.

While mother was talking, the social worker was able to observe both children, despite the fact that mother would not allow the social worker to speak with the children. Mother said she had asked the school about counseling for her children because of the experience of being handcuffed and put in a police car. The children appeared neat without any marks or bruises. Both children appeared concerned for their mother, as she was crying at times and expressing her frustration. Both children appeared healthy and well nourished.

The social worker interviewed Teresa, who stated that on the day of the incident she and mother had gone to a food bank. They returned to Teresa's house with the groceries. By the time she made her way to the porch, Teresa already heard arguing. She saw mother and Alicia arguing in the hallway of her home and attempted to separate them. She had mother go to Natasha's room and had Alicia go into her bedroom. Alicia then came out of her room, rushed to Natasha's room, and jumped on mother. Alicia broke down the door to Natasha's room trying to get to mother. Mother left the house and was later arrested. Teresa confirmed that mother's children and Alicia's children were present during the altercation.

The social worker inquired if Alicia was available to speak with her. Teresa said the social worker could not come in the residence because she could not "put the dogs up" at that time. Instead, Alicia came outside. She was very upset and reported that she was not the one who started the fight. She said that she and her children were victims in the incident. The social worker wanted to interview Alicia and her children about the incident and told Alicia that she would return to the home on a specific date.

On December 9, 2014, when the social worker returned to Teresa's residence, Alicia allowed the social worker to enter the home. Alicia explained that on the date of the incident, mother had entered the home "saying things about the home and she was using inappropriate words" towards Alicia. Alicia and mother began to argue. Mother then picked up a cane and hit Alicia on the back and shoulders. All the children were present during the altercation. Alicia's three children tried to break up the fight, but mother asked her children to fight Alicia's children. The fight then broke up and mother left. Alicia called the police, and the officers took her statement and pictures of her injuries.

Alicia admitted to past altercations with mother. When Alicia was 13 or 14 years old, she and mother had a fight which resulted in Alicia being sent to juvenile hall. When she was released she was placed in protective custody and lived in various foster homes until the age of 17. In January 2014, she moved in with Teresa to rebuild their relationship. Alicia consented to the social worker interviewing her children.

Alicia's seven-year-old child, Amari, informed the social worker that he was present during the fight between mother and Alicia. He had been in his bedroom watching television when he heard Alicia and another woman talking. Teresa told mother and Alicia to "break it up." Amari came out of his room and saw mother pick up Teresa's cane and hit Alicia with it on the back. Mother then told Joshua to grab a knife, which he did, from the kitchen. He later put it back. Amari was scared and said no one fought in the home before this incident.

Alicia's 10-year-old daughter, Amelya, also witnessed the fight. Initially, mother and Alicia were arguing, though Amelya did not remember what they were arguing about. Amelya saw mother pulling Alicia's hair, and mother hit Alicia with a cane. Mother told Joshua to get a knife. Amari's and Amelya's sibling, Amaya, told Joshua to stop, so Joshua put the knife back. Amelya and her siblings were crying during the altercation. Amelya denied any previous violence in the home.

Alicia's other daughter, 10-year-old Amaya, also witnessed the fight. She did not know what mother and Alicia were arguing about, but saw mother pulling Alicia's hair

5

and beating her with a cane. Amaya tried to break up the fight but Joshua started "socking" her and her sister. Mother told Joshua to get a knife, but he did not. Amaya had never before seen mother and Alicia fight.

On December 10, 2014, the social worker obtained a police report of the incident, which disclosed that deputy sheriffs Perez and Hoyos came to Teresa's home after a call regarding an assault with a deadly weapon. Alicia informed the deputies that she was in her room when mother confronted her about paying bills in Teresa's home. As the argument escalated, mother grabbed a wooden cane and struck Alicia several times on her upper body. After the cane broke into several pieces, mother ran out and went home. Alicia identified mother as the person who struck her with a wooden cane. Mother refused to provide a statement.

Alicia had several bruises, cuts, and a red swollen area on her forehead. Alicia refused medical attention. Alicia's injuries appeared to be consistent with use of a wooden cane. The deputies arrested mother for assault with a deadly weapon and made a referral to DCFS.

On December 16, 2014, the social worker contacted Detective Bell at the Sheriff's station in Compton. He informed the social worker that mother had a hearing on December 19, 2104, at which time the district attorney would decide whether charges would be filed against mother.

**Prior child welfare history**

The detention report included the following information regarding prior DCFS referrals.

On December 29, 1999, DCFS received a referral alleging caretaker absence/ incapacity by mother. A relative reported that mother left Natasha with someone unable to care for the child while mother was in jail. Instead, mother had left Natasha in the care of maternal grandmother, who was able to provide care for her. The referral was closed as unfounded.

A January 8, 2002 referral alleged physical abuse of Natasha by mother. The mandated reporter said mother hit Natasha on the face with a shoe. Mother admitted to

6

accidentally hitting Natasha with a slipper. There were no marks or bruises on Natasha. The referral was closed as inconclusive.

A November 14, 2002 referral alleged general neglect of the children by mother. The mandated reporter said that father was arrested for narcotics charges and the home was "deplorable." The charges against father were dropped. Mother's home was found to be safe and clean. The referral was closed as inconclusive.

A January 9, 2003 referral alleged physical abuse by mother of a relative who was a minor and substantial risk to the children. The mandated reporter said mother's then minor sister claimed that mother became angry with her and hit her with a broom. The referral was closed as inconclusive.

A January 6, 2004 referral alleged general neglect and emotional abuse of the children by the parents. The reporting party stated that the parents left the children home without any supervision. The referral was closed as unfounded.

A March 10, 2004 referral alleged general neglect and emotional abuse of the children by mother. Father reported mother's room was filthy and she left the children with a babysitter so she could go out at night. DCFS concluded the referral was unfounded as it appeared father trashed mother's home as a set up, and mother's behavior was appropriate.

A May 7, 2004 referral alleged general neglect as to Natasha, Joshua and Nylah by mother. The reporting party was conducting a fraud investigation of father. The property owner informed the reporting party that the children were left unsupervised by mother. Natasha had been seen pushing Nylah in a stroller with Joshua on her side without any supervision. The referral was closed as unfounded.

A February 1, 2005 referral alleged sexual abuse of then three-year-old Joshua and his sisters, then two-year-old Nylah and 10-year-old Natasha, by father. The sexual abuse allegation was closed as unfounded. However, the allegation for emotional abuse of the children was substantiated as to both parents. The referral resulted in a voluntary maintenance plan from May 5, 2005 through August 11, 2005.

A June 14, 2012 referral alleged severe neglect, which was downgraded to general neglect. Joshua had been injured after climbing on to the back of a truck. The parties interviewed stated that the incident was an accident. Law enforcement found no crime. Mother followed up with all the necessary medical appointments for Joshua, who disclosed that he was told to stop climbing on the back of the truck. The referral was closed as inconclusive.

On November 13, 2012, there was a referral alleging physical abuse of Natasha by mother. The physical abuse referral was closed as inconclusive, as Natasha turned 18 years old, no longer resided in the home, and her whereabouts were unknown. The initial allegation was that there was an argument between mother and then 17-year-old Natasha. Natasha sustained injuries from the argument and had to be treated at the hospital. Natasha reported that mother hit her with a stick because of Natasha's poor grades and career path. Mother said she was defending herself against Natasha, who sprung on her after mother confronted her about her grades.

**The parents' criminal history**

The parents' criminal history was also set forth in the detention report. Mother had the following criminal history: (1) an April 18, 1985 misdemeanor conviction for battery on a police officer/emergency person; (2) a January 7, 1987 misdemeanor conviction for battery; (3) a May 13, 1988 misdemeanor conviction for false identification to a peace officer; (4) an April 9, 1999 misdemeanor conviction for fraud to obtain aid; (5) July 14, 2000 felony convictions for burglary, forgery, and possessing a bad check; and (6) a June 21, 2011 misdemeanor conviction for force/assault with a deadly weapon not a firearm, great bodily injury likely.

Father had arrests for use of a controlled substance in 1987; two DUI convictions from 2005 and 2006; and an arrest for inflicting corporal injury on a spouse in 2002.

**Removal order**

On December 19, 2014, DCFS requested an order of removal of the children, which was granted on December 22, 2014.

The social worker made several attempts to execute the warrant, but mother did not make herself available to DCFS. The social worker went to mother's home on December 30, 2014, at 11:00 a.m. and 7:00 p.m., but mother did not answer the door. Deputy Hoyos accompanied the social worker at 7:00 p.m. to mother's residence where they saw lights and the television on, but no one would answer the door.

The social worker went to mother's home again on December 31, 2014, at 8:00 a.m. The social worker observed a truck leaving the residence. The social worker noted that mother appeared to be avoiding her. DCFS filed a protective custody warrant request for the children.

## Detention hearing

At the January 6, 2015 detention hearing, the juvenile court noted that mother claimed American Indian heritage in the Choctaw and Cherokee tribes. The juvenile court ordered DCFS to serve ICWA notices to the Choctaw and Cherokee tribes, the Bureau of Indian Affairs, and the Secretary of the Interior.

The juvenile court found a prima facie case for detaining the children and ordered them released to the parents' custody over DCFS's objection. The juvenile court ordered mother to enroll in an anger management program. Alicia was ordered not to have contact with the children. The court set a contested jurisdictional hearing.

## Jurisdiction/disposition report

On February 17, 2015, DCFS filed a jurisdiction/disposition report in which it was reported that on February 12, 2015, mother went to the DCFS office to provide information regarding her Native American heritage, noting that Joshua and Nylah might be eligible for membership in the Cherokee, Choctaw, and Seminole tribes.

Joshua and Nylah were interviewed on February 12, 2015, at the DCFS office. Joshua stated that he was outside and thus not present when his mother and Alicia had the fight.

Nylah stated that on the date of the incident, she saw mother and Alicia arguing and took a baby that was present to the kitchen area of the home. Nylah denied witnessing any kind of physical altercation.

9

The DCFS investigator made several attempts to contact mother, but mother refused to make herself available to DCFS. The investigator called mother on February 5 and 6, 2015, and went to the home on February 12, 2015, but was unable to interview mother.

On February 5, 2015, mother went to the DCFS office and provided the investigator with copies of the detention report, police report, Teresa's written statement, the jury verdict from mother's criminal case, a letter from the district attorney, an anger management completion letter, a letter from a previous 2005 DCFS case, and mother's statements regarding the allegations in the detention report. When the investigator attempted to interview mother, mother replied "'Everything you need to know is in this letter. Read it and if you have any questions, call me.'" Mother said she was going on vacation for a month. The investigator reported that mother smelled of alcohol and marijuana when she dropped off the documents.

On February 12, 2015, mother was interviewed at the DCFS office. Mother denied the allegations in the section 300 petition, stating that when she came into Teresa's home on November 26, 2014, Alicia jumped on her. Mother denied telling Joshua to strike anyone, and denied attacking Alicia. After the incident, mother gathered her children and walked home, leaving her vehicle at Teresa's home. Mother denied using objects to defend herself in the altercation. Mother disclosed that she and father had an incident of domestic violence in 2002.

Teresa was interviewed on February 13, 2015. She denied that mother did anything to provoke the altercation. Teresa said Alicia was angry and started beating mother.

Father was also interviewed and admitted to incidents of domestic violence between mother and him. He and mother would get into verbal altercations and mother would assault him. Although father had a family law order, mother would choose when he got to visit the children. The last time he saw Joshua and Nylah was at the January 6, 2015 hearing. He had not seen them since.

10

A criminal court docket was attached to the report, indicating that a jury found mother not guilty of the November 13, 2012 charge of assault with a deadly weapon. Also attached was a progress report for an anger management program dated June 1, 2011. Mother further provided a letter from the district attorney's office dated December 19, 2014, stating that the office declined to file charges against mother for assault and battery in the November 2014 incident.

**Supplemental and last minute reports**

DCFS submitted a document entitled "County of Los Angeles-Sheriff's Department-Supplementary Report" dated December 10, 2014. The report was completed by Detective Bell. On November 30, 2014, he contacted Alicia about the incident with mother. Alicia stated that when mother arrived at Teresa's residence, mother told Alicia, "'We need to talk.'" Alicia responded, "'We have nothing to talk about.'" Mother got upset and stated "'You don't know who you are talking to.'" During this time, Teresa had put down her wooden walking cane in an attempt to get between mother and Alicia.

After Teresa got between mother and Alicia, mother picked up the walking cane and hit Alicia with the cane on her upper body and struck her once on the head. Mother hit Alicia several times on her upper body before the cane broke. Mother held on to the broken cane that had a sharp tip and threatened Alicia with it, stating she was going to stab Alicia. Mother did not carry through with the threat but turned around and left.

On December 10, 2014, Detective Bell spoke to Teresa. Teresa stated she lived with Alicia and mother's adult daughter. By the time Teresa walked into the home on November 26, 2014, mother and Alicia were already arguing. Teresa stepped in between them and told Alicia to go to her room and shut the door. Teresa then told mother to go in her daughter's room and shut the door. Mother and Alicia continued to yell at each other behind the closed bedroom doors. As Teresa was walking down the hallway, Alicia came from her bedroom and kicked in the door of the room where mother was waiting. They physically fought and struggled with each other. At some point, mother grabbed Teresa's cane and swung the cane at Alicia. Teresa did not see if the cane struck Alicia.

11

Detective Bell made several unsuccessful attempts to contact mother.

Attached to the supplemental report were photographs of Alicia's injuries and the broken cane.

In a last minute information for the court, DCFS provided the information collected regarding Indian heritage. The Choctaw Nation of Oklahoma said the tribe was unable to establish Indian heritage for Joshua. The Mississippi Band of Choctaw Indians stated Joshua and the relatives listed were not enrolled members or eligible for enrollment in the tribe. On May 12, 2015, the Cherokee Nation sent a letter requesting more information regarding mother and the children. The investigator stated that she provided the requested information to the Cherokee Nation. The investigator provided the return receipts for the Jena Band of Choctaw Indians, Cherokee Nation of Oklahoma, Bureau of Indian Affairs, Choctaw Nation of Oklahoma, Mississippi Band of Choctaw Indians, and Secretary of the Interior.

In a June 15, 2015 last minute information for the court, the investigator attached a police report dated November 13, 2012, relating to the altercation between mother and Natasha. When the police arrived, Natasha was being treated for lacerations on both forearms. Natasha's arms were bandaged, and her left arm was immobilized and in a sling.

Natasha explained that she and mother were having an argument about her schooling. Mother started to yell and stormed out of the room. Mother returned several seconds later holding a piece of wood approximately three feet long and one half inch thick with a pointed edge. Natasha got up and attempted to leave the room, but mother swung the piece of wood towards Natasha's head. Natasha blocked mother's attack by placing her forearms above her head. Natasha said mother struck her approximately seven to ten times on her wrists and forearms, causing multiple lacerations. The deputies noted that Natasha was crying when she related the incident, and she was transported to Harbor General Hospital.

When the deputies knocked on her door, mother did not answer. However, the door was ajar so the deputies entered to determine if there were any other victims. They

12

found mother in a bedroom which smelled of marijuana. The entire room was filled with haze and smoke as if mother had just finished smoking marijuana. The deputies found a substance resembling marijuana as well as marijuana stems in the closet.

Mother acknowledged that she and Natasha were arguing, but said it was Natasha who picked up the wooden stick which she used to try and strike mother. Mother took control of the stick and swung it at Natasha. Mother claimed she acted in self-defense. The deputies arrested mother for assaulting a child causing great bodily injury and possession of marijuana. Mother said she was a medical marijuana patient in legal possession of the drug. Mother admitted to smoking marijuana prior to the deputies' arrival.

When the deputies visited Natasha in the hospital, they found her injuries were consistent with placing her arms above her head in a defensive position.

Attached to the last minute report were more responses from the tribes, the return receipts from the Mississippi Band of Choctaw Indians, Jena Band of Choctaw Indians, Secretary of the Interior, Bureau of Indian Affairs, Choctaw Nation of Oklahoma, and Cherokee Nation of Oklahoma for Nylah, and the ICWA notices prepared for Joshua. The May 27, 2015 letter from the Cherokee Nation stated that Joshua did not meet the definition of an Indian child. On May 28, 2015, the Choctaw Nation of Oklahoma indicated it was unable to establish Indian Heritage for Nylah. The ICWA notices contained the case name Nylah N. and the name Joshua N. with his date of birth. Joshua's ICWA notices were mailed to the Bureau of Indian Affairs, the Secretary of the Interior, the Cherokee Nation of Oklahoma, the Choctaw Nation of Oklahoma, the Jena Band of Choctaw Indians, and the Mississippi Band of Choctaw Indians.

**Jurisdiction/disposition hearing**

The jurisdiction/disposition hearing took place on June 15, 2015. The juvenile court found that ICWA did not apply.

Eighty-one-year-old Teresa testified that she is mother's godmother, and explained that she was not present when the altercation began. Rather, she was in the car waiting for mother to unload her groceries. When she went into the house, she saw mother and

13

Alicia arguing. Teresa was in the living room hallway and mother was in Natasha's room. Alicia was in her bedroom. The children were in Teresa's grandchildren's room.

After Teresa tried to calm mother and Alicia, Alicia rushed down the hall, pushing Teresa and knocking the cane out of her hand. Alicia kicked Natasha's door and knocked it off the hinge. Teresa saw mother and Alicia fighting. Teresa thought mother picked up the cane to defend herself. Teresa noted that the cane was broken at the end of the fight, though she did not know who had broken the cane. Teresa denied the children were involved in the fight, and denied that mother was the aggressor. She had never seen mother act violently, except when she had to defend herself. Teresa did not have any concerns regarding mother's ability to parent her children.

During cross-examination, Teresa admitted that mother asked Joshua to get a knife. Teresa told Joshua not to get the knife and he obeyed.

Teresa admitted that there was a DCFS investigation due to a fight Alicia had with mother when Alicia was a minor.

The DCFS investigator testified that she interviewed mother, the children, and Teresa, but was unable to interview Alicia. During the investigation, the investigator did not have any concerns about the care mother provided her children. Mother was well versed on Joshua's Individualized Education Plan and the children were doing well in school. It was the investigator's belief that mother's history of violent assaults on other parties, including the incident leading to the detention and the 2012 incident with Natasha, placed the children at risk of harm. The investigator was unaware of any incidents between mother and the children. However, the investigator noted that the social worker had difficulty reaching mother and seeing the children.

The children, through their counsel, requested that the section 300 petition be sustained under section 300, subdivision (b). The children's counsel argued that DCFS met its burden and this was not an isolated incident. The children's counsel noted that the children felt safe with mother and wanted the case closed.

The juvenile court sustained the allegation under section 300, subdivision (b) because mother had a history of assault and battery. While the court found that mother

did not initiate the altercation, mother escalated it by telling Joshua to get a knife. This was indicative of issues of anger management. In addition, the court noted that mother did not become cooperative with DCFS until the last minute. The juvenile court found that mother's anger management issues and history of violence placed the children at risk.

The juvenile court declared the children dependents of the court under section 300, subdivision (b), and made a home of parents order. The court ordered family maintenance services for the parents, and set the matter for a section 364 review hearing.

On June 16, 2015, mother filed her notice of appeal.

**DISCUSSION**

## I. Substantial evidence supports the juvenile court's jurisdictional findings

### A. *Applicable law and standard of review*

On appeal from an order making jurisdictional findings, the court's findings must be upheld unless, after reviewing the entire record, resolving all conflicts in favor of the respondent, and drawing all reasonable inferences in support of the judgment, there is no substantial evidence to support the findings. Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

"A reviewing court may not 'consider whether there is evidence from which the dependency court could have drawn a different conclusion,' but is limited to determining whether 'there is substantial evidence to support the conclusion that the court did draw.' [Citation.]" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 113.)

On the other hand, a decision supported by a mere scintilla of evidence need not be affirmed on appeal. The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record. (*In re James R.* (2009) 176 Cal.App.4th 129, 134-135.)

Section 300, subdivision (b) is applicable if: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect

the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."

In enacting section 300, subdivision (b), the Legislature intended to protect children who are currently being abused and "to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194-196 (*Heather A.*).)

A jurisdictional finding under section 300, subdivision (b) requires substantial evidence of: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) serious physical harm or illness to the child or a substantial risk of such harm or illness. (*In re James R., supra*, 176 Cal.App.4th at p. 135.) The third element effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.)

A determination of whether a child is at substantial risk of harm should be made by looking at the totality of the circumstances, including the severity of the incidents, whether there was a substantial lapse of time between the instances of abuse and the filing of the section 300 petition, the amount of contact between the child and the parent, and whether the parent has adequately addressed the issues that led to the harmful conduct. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1440.)

### B. *The evidence supports the court's finding of a substantial risk of harm*

Mother argues there was no evidence of a substantial risk of harm to the children arising from her actions. Additionally, mother argues that DCFS based its assessment of current risk on two incidents in which mother was accused of criminal assault. The first was the incident that took place between mother and Alicia in November 2014. Mother points out that the criminal charges against her were dropped.

16

The other was the 2012 matter involving an altercation between mother and her now adult daughter, Natasha. Mother points out that a jury acquitted her of charges in the 2012 matter. In addition, DCFS investigated the incident and found the allegation of child abuse inconclusive.

DCFS admitted that there was no evidence that mother had ever displayed uncontrolled anger towards Joshua or Nylah. In fact, the evidence showed that mother took good care of her children and was a strong educational advocate for both of them.

Mother points out that in the November 2014 incident involving an altercation with Alicia, Alicia was the only person who claimed that mother was the aggressor. Mother argues that all other witnesses agreed that mother was the victim.

Even if mother had been the aggressor, mother argues, this fact alone would not necessarily mean that the children were at risk of harm. Mother cites *In re Drake M.* (2012) 211 Cal.App.4th 754, 758-759 (*Drake M.*), for the proposition that the agency must produce evidence that, at the time of the jurisdictional hearing, there is a substantial risk that a child will suffer serious physical harm or illness. (See also *In re David M.* (2005) 134 Cal.App.4th 822, 830 (*David M.*) [Where mother suffered from drug problems and father had history of mental illness, court concluded "The record on appeal lacks any evidence of a specific, defined risk of harm to either David or A. resulting from mother's or father's mental illness, or mother's substance abuse"].) Mother argues that here, as in *Drake M.* and *David M.*, there is no evidence that mother posed any risk of harm to Joshua or Nylah.

We find *Drake M.* and *David M.* to be distinguishable. *Drake M.* involved a parent's use of medical marijuana. *David M.* involved the mental illness of both parents and substance abuse of one parent. Here, in contrast, mother's conduct arises from issues of anger management, exposing her children to violence, and attempting to involve her children in the violence.

Unlike the situations in *Drake M.* and *David M.*, the evidence in the present matter was sufficient to support a finding that Joshua and Nylah were at substantial risk of harm at the time of the jurisdictional hearing. The record showed an extensive history of

violence on the part of mother towards both family members and others. In addition to the November 2014 altercation with Alicia and the 2012 altercation with Natasha, there was an allegation of physical abuse by mother against Natasha in 2002 as well as a 2003 referral alleging that mother hit her minor sister with a broom. Also, father reported that there was violence between him and mother in which mother was the aggressor.

Mother had an extensive criminal history involving aggressive conduct. In 1985 she was convicted of misdemeanor battery of a peace officer/emergency person. In 1987 she was convicted of misdemeanor battery, and in 2011 she was convicted of misdemeanor assault with a deadly weapon (not a firearm) with great bodily injury likely. The juvenile court was entitled to consider this past history. Further, we note that the juvenile court appeared particularly troubled by mother's instruction to Joshua to get a knife. The juvenile court was entitled to believe the testimony that mother had attempted to involve Joshua in the altercation in this way. Mother's instruction to Joshua to get a knife, with the apparent purpose of having him assist and become involved in the violent altercation, certainly placed him at risk of physical harm. Looking at the record as a whole, the evidence supports the juvenile court's determination that Joshua and Nylah were at substantial risk of harm due to mother's tendency to engage in physical violence with others. The children were at substantial risk of harm from being exposed to mother's violent conduct. They were also at risk of becoming victims of her violent conduct, or becoming involved in mother's fights with other people.

The juvenile court need not wait until Joshua or Nylah is harmed before taking action to protect them from mother's aggressive conduct. (*Heather A., supra*, 52 Cal.App.4th at pp. 194-196.) The record as a whole supported the juvenile court's determination that the children were at substantial risk of harm.

## II. Limited remand on ICWA compliance is warranted

### A. *Applicable law*

ICWA accords Indian tribes the right to intervene at any point in a state court dependency proceeding involving an Indian child. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174.) To ensure the tribe will be afforded the opportunity to

intervene and assert its rights in the action, the statute requires that notice be given to the appropriate tribe in any dependency proceeding involving an Indian child.[4]

In California, section 224.2 governs ICWA notice in dependency proceedings. Subdivision (a) of that statute provides in relevant part: "If the court, a social worker, or probation officer knows or has reason to know that an Indian child is involved, any notice sent in an Indian child custody proceeding under this code shall . . . comply with all of the following requirements: [¶] (1) Notice shall be sent by registered or certified mail with return receipt requested. Additional notice by first-class mail is recommended, but not required. [¶] (2) Notice to the tribe shall be to the tribal chairperson, unless the tribe has designated another agent for service. [¶] (3) Notice shall be sent to all tribes of which the child may be a member or eligible for membership, until the court makes a determination as to which tribe is the child's tribe in accordance with subdivision (d) of Section 224.1, after which notice need only be sent to the tribe determined to be the Indian child's tribe."

California law also imposes an "affirmative and continuing duty" on the court and the Department "to inquire whether a child for whom a petition . . . is to be, or has been, filed is or may be an Indian child in all dependency proceedings." (§ 224.3, subd. (a).) Subdivision (c) of section 224.3 sets forth the steps to be taken when making further inquiry regarding a child's Indian status:

---

[4] The ICWA notice provision states: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding." (25 U.S.C. § 1912(a).)

19

"If the court, social worker, or probation officer knows or has reason to know that an Indian child is involved, the social worker or probation officer is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.2, contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership in and contacting the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility."[5]

### B. Failure to comply with ICWA notice requirements

Mother argues that there were several problems with the ICWA notices in this matter. First, while the court acknowledged its duty to inquire and ordered DCFS to investigate the children's possible affiliation with the Cherokee and Choctaw tribes, it was unclear whether the tribes were given notice regarding both children. While Nylah's name was on the top of the notice form, only Joshua and his birth date were included in the section requiring the child's name. No separate form appears to have been sent to the tribes specifically regarding Nylah. Only one tribe responded with respect to Nylah. At the time of the juvenile court's decision, responses were still pending for all other tribes regarding Nylah.

As to Joshua, no responses had been received from the Bureau of Indian Affairs, the Secretary of the Interior, or the Jena Band of Choctaw Indians. All other noticed tribes indicated that Joshua did not meet their respective criteria to be an Indian child.

---

[5]     The statutory inquiry requirements are implemented by rule 5.481(a) of the California Rules of Court. Subdivision (a)(4)(A) of rule 5.481 provides that inquiry regarding a child's Indian heritage shall include "[i]nterviewing the parents, Indian custodian, and 'extended family members' as defined in 25 United States Code section 1901 and 1903(2), to gather the information listed in Welfare and Institutions Code section 224.2(a)(5) . . . which is required to complete the *Notice of Child Custody Proceeding for Indian Child* (form ICWA-030)."

With respect to both Joshua and Nylah, the court never acknowledged mother's claim of Seminole heritage and DCFS never sent notice to the Seminole tribe or to the Bureau of Indian Affairs or the Secretary of the Interior regarding this claim.

Thus, mother argues, the court's ICWA ruling on June 15, 2015, was premature. Responses were still pending from various tribes, and notice was never given to the Seminoles. In addition, the attempt by DCFS and the court to apply responses from various tribes concerning Joshua to Nylah was a notice violation. (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989-990 [improper to bootstrap child's case to his half-sibling's case for ICWA purposes].)

DCFS concedes that the notice requirements of ICWA may not have been met in this case. DCFS requests a remand to the juvenile court with directions for the sole purpose of providing proper notice to the federally recognized Cherokee and Choctaw tribes for Nylah, and proper notice to the federally recognized Seminole tribes for both children. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 706 ["The limited reversal disposition in defective notice ICWA appeals is in keeping with the public policy of our child dependency scheme, which favors prompt resolution of cases"].) Failure to comply with the inquiry and notice requirements of ICWA does not require reversal of the juvenile court's dispositional order. (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 384-385.) As we noted in *Brooke C.*, "the only order which would be subject to reversal for failure to give notice would be an order terminating parental rights" (*id.* at p. 385), and such an order is not at issue in these proceedings.

## DISPOSITION

The matter is remanded to the juvenile court for compliance with ICWA and applicable related California law. If, after proper inquiry and notice, a tribe claims that Joshua or Nylah is an Indian child, or if other information is presented to the juvenile court that suggests Joshua or Nylah is an Indian child, the juvenile court is ordered to conduct a new hearing in conformity with the provisions of ICWA relating to child custody proceedings involving Indian children, and the children, the tribe, and mother

21

may petition the juvenile court to invalidate any orders that violate ICWA.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT