Filed 12/8/21  In re G.D. CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re G.D., Person Coming Under the Juvenile Court Law. | B311108 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.D.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 18CCJP06036 |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Commissioner. Reversed and remanded.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court exercised jurisdiction over G.D., the child of D.M. (mother)[1] and S.D. (father) under Welfare and Institutions Code section 300, subdivision (b).[2] The court found father violated, and mother failed to enforce, a restraining order requiring him not to have contact with G.D. except during monitored visits. It therefore found the parents placed G.D. at substantial risk of serious physical harm, given father's history of: (1) inflicting domestic violence on mother; (2) substance abuse; and (3) convictions for drug-related and violent crimes.

At the dispositional hearing, the juvenile court placed G.D. with mother under the supervision of the Department of Children and Family Services (Department). It also found the Department had satisfied its duties of inquiry and notice under the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et seq. (ICWA). Further, while the Department had yet to receive responses to ICWA-030 notice forms it had sent to two tribes, the court found no further analysis into the Department's compliance with ICWA was required because G.D. was placed with mother.

On appeal, father contends: (1) the juvenile court prejudicially erred by adjudicating the section 300 petition in his absence, in violation of his right to be present under Penal Code section 2625; (2) the jurisdictional findings are unsupported by substantial evidence; and (3) the juvenile court erred by finding the Department satisfied its duties of inquiry and notice under ICWA, and that no further analysis into its compliance with

---

[1] Mother is not a party to this appeal.

[2] Unless otherwise specified, all further undesignated statutory references are to the Welfare and Institutions Code.

ICWA was required given G.D.'s placement with mother. As discussed below, we agree with his first and third contentions of error. We therefore need not address his second contention. Thus, we reverse the jurisdictional and dispositional orders, vacate the juvenile court's ICWA findings, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

Mother and father have one child together, G.D., born in November 2014. At the time this case arose in July 2020, G.D. resided with mother and his three older maternal half-siblings: J.T., born in March 2003, E.T., born in August 2004, and M.T., born in August 2009. Although the underlying dependency case pertained to all four of the children in mother's care, this appeal relates only to G.D.

The family was involved in a prior dependency case initiated in September 2018, when the Department filed a section 300 petition on behalf of J.T., E.T., M.T., and G.D. The juvenile court sustained the petition on December 7, 2018, finding true its allegations that the children were at risk of harm due to father's infliction of domestic violence on mother, his abuse of illicit drugs, his unresolved history of engaging in dangerous criminal activity, and mother's failure to protect the children from him. On December 21, 2018, the juvenile court issued a permanent restraining order in favor of mother, which is set to expire on December 21, 2021. Among other things, the restraining order requires father to stay away from G.D. except during monitored visits.

The juvenile court terminated jurisdiction over the children in June 2019 and issued an order granting mother sole legal and physical custody of G.D. The court also granted father monitored

3

visitation and ordered the parents to abide by the restraining order issued in December 2018.

As noted above, this case arose in July 2020, when the Department received a referral alleging the children were being emotionally abused by father and neglected by mother. The reporting party stated that even though mother has an active restraining order against father, she has allowed him to frequent her home. Further, two days before, the reporting party saw father "throwing 'stuff' at mother's front door" while "mother was yelling at him through the window." According to the reporting party, "[t]he children cry because mother and father are arguing."

During its initial investigation, the Department was unable to contact father. Nonetheless, on September 8, 2020, the juvenile court authorized a warrant for the children's detention. They were placed with their maternal grandmother on that date.

Two days later, the Department filed a petition on the children's behalf under section 300, subdivisions (a), (b), and (j). The petition alleged that "[o]n prior occasions," mother "failed to enforce," and father "failed to comply with," the December 2018 restraining order "by having contact with one another." It also alleged mother "allowed . . . father to reside in the children's home and have unlimited access to [them]" in violation of the restraining order. Thus, the petition alleged that by failing to abide by the restraining order, the parents placed the children at risk of harm, given father's: (1) history of inflicting domestic violence on mother (counts a-1, b-1, and j-1); (2) history of substance abuse and current use of methamphetamine (counts b-2 and j-2); and (3) history of dangerous criminal activity (counts b-3 and j-3).

4

Sometime after the petition was filed, the Department conducted a due diligence search to ascertain father's whereabouts. The search revealed he was arrested in September 2020 for violating the terms of his post-release community supervision. As of October 2020, he was still incarcerated.

The adjudication hearing was initially set for November 3, 2020. At that hearing, however, the juvenile court granted the request by father's recently-appointed counsel to continue the petition's adjudication so father could speak to counsel about the allegations against him. Accordingly, the juvenile court continued the adjudication hearing to December 14, 2020. Further, after being informed that father indicated he may have Native American ancestry, and that ICWA-related issues had arisen in a pending dependency case pertaining to G.D.'s paternal half-brother, the juvenile court instructed the Department to ascertain whether those issues had any "possible connection" to the proceedings in the present case.

At the December 14, 2020 hearing, father's counsel again asked the juvenile court to continue the adjudication hearing because the Department had yet to interview father regarding the petition's allegations,[3] and "there [were] still issues related to [ICWA] that . . . need[ed] to [be] sort[ed] out[.]" The court granted the request and continued the adjudication hearing to January 12, 2021. It also ordered the Department to send out ICWA notices regarding G.D., and to prepare and submit an order authorizing father's appearance at the next hearing.

---

3  On December 8, 2020, a Department social worker went to father's place of incarceration to speak with him, but was unable to do so because his unit had been placed on a two-week quarantine, presumably due to COVID-19.

On January 6, 2021, a Department social worker spoke with G.D.'s paternal great-uncle, whom father indicated may have more information about his Native American heritage. Paternal great-uncle stated the family "possibly ha[d] some Apache native ancestry" and "may have Navajo native ancestry[.]" Subsequently, on January 8, 2021, the Department sent ICWA-030 notices regarding G.D.'s dependency case to his parents, the Sacramento Area Director of the Bureau of Indian Affairs, the Secretary of Interior, and the following tribes: Apache Tribe of Oklahoma; Fort Sill Apache Tribe; Jicarilla Apache Nation; Mescalero Apache Tribe; San Carlos Apache Tribe; Tonto Apache Tribe of Arizona; White Mountain Apache Tribe; Yavapai-Apache Nation; Colorado River Indian Tribes; and Navajo Nation.

Father was not present at the January 12, 2021 hearing.[4] Consequently, at the outset of the hearing, his counsel asserted she knew he wanted to be present, objected to the court proceeding with the petition's adjudication in his absence, and "request[ed] a brief continuance for him to be present." She noted father was set to be released from custody later that month. The court denied the request and sustained counts b-1,[5] b-2, and b-3. Counts a-1, j-1, j-2, and j-3 were stricken.

---

4    The parties do not dispute that although the Department prepared an order for father's removal from custody for purposes of attending the hearing, the order apparently was never signed by the bench officer.

5    The juvenile court amended count b-1 by interlineation to read as follows: "The mother failed to protect the children in that [she] allowed . . . father to *frequent* the children's home and have *unrestricted* access to [them.]" (Italics added.) While counts b-2

6

With respect to disposition, the Department requested the proceedings be continued because it was still waiting for several tribes to respond to the ICWA-030 notice forms it had sent. The juvenile court granted the request and continued the dispositional hearing to March 9, 2021. It also ordered the Department to "supply follow-up information on ICWA."

Father was released from custody on January 29, 2021. Five days later, on February 4, 2021, a Department social worker interviewed father for the first time regarding the petition's allegations. Shortly thereafter, on February 8, 2021, the social worker was informed by father's girlfriend that he had been arrested again.

Before the dispositional hearing, the Department received responses to the ICWA-030 notice forms from the following tribes: Fort Sill Apache Tribe; Mescalero Apache Tribe; Tonto Apache Tribe; San Carlos Apache Tribe; and Yavapai-Apache Nation. In each response, the tribe stated G.D. was not enrolled in the tribe or eligible for enrollment therein.

The ICWA-030 notice forms sent to Navajo Nation and Jicarilla Apache Nation were returned to the Department, as the packages had gone unclaimed and could not be forwarded. Therefore, on March 3, 2021, a Department social worker contacted both tribes by phone. The representative from Navajo Nation provided an updated address and instructed the social worker to email the notice form to her for an expedited response. The representative from Jicarilla Apache Nation informed the social worker that notice forms are only accepted by mail, and

---

and b-3 contained identical language regarding mother's failure to protect, the court did not amend those counts.

7

provided a new address. Per this new information, the social worker sent the ICWA-030 form to the email address provided by the Navajo Nation representative, and mailed another copy of the form to the updated address for Jicarilla Apache Nation.

At the dispositional hearing held on March 9, 2021, counsel for the children and father informed the juvenile court that Navajo Nation and Jicarilla Apache Nation had yet to respond to the ICWA-030 notices, which had been recently resent. Nonetheless, the juvenile court found "ICWA notice has been given as required by law." Subsequently, the court declared G.D. a dependent of the court and placed him with mother under the Department's supervision. Father's counsel "object[ed] to . . . [the court's finding of] ICWA being . . . proper unless the court is continuing or setting [a] progress [hearing] on results from . . . Jicarilla [Apache Nation] and Navajo Nation." The juvenile court responded it was "not going to consider a progress report[ ]" because it had issued a "home of parent order."

Father timely appealed.

## DISCUSSION

### I. Violation of Father's Right to Be Present for Adjudication under Penal Code Section 2625

#### A. Governing Legal Principles

Penal Code, section 2625, subdivision (d) provides: "Upon receipt by the court of a statement from the prisoner or the prisoner's attorney indicating the prisoner's desire to be present during the court's proceedings, the court shall issue an order for the temporary removal of the prisoner from the institution, and for the prisoner's production before the court. . . . [A] petition to adjudge the child of a prisoner a dependent child of the court

8

pursuant to subdivision (a), (b), (c), (d), (e), (f), (i), or (j) of Section 300 of the Welfare and Institutions Code may not be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or a designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding." "[T]he statute requires *both* the prisoner *and* the prisoner's attorney to be present." (*In re Jesusa V.* (2004) 32 Cal.4th 588, 622, italics in original.)

The violation of a prisoner's right to be present under Penal Code section 2625 is not jurisdictional, and therefore is not reversible per se. (See *In re Jesusa V.*, *supra*, 32 Cal.4th at pp. 624-625.) In evaluating whether violation of this statutory right requires reversal, we "apply[ ] [the] familiar harmless-error test" set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*In re Jesusa V.*, *supra*, at p. 625.) Under that test, reversal is required where "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, at p. 836.)

## B.    Analysis

The parties do not dispute that the juvenile court ran afoul of Penal Code section 2625, subdivision (d) by adjudicating the section 300 petition in father's absence. Consequently, resolution of this issue turns on whether "it is reasonably probable that a result more favorable to [father] would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

9

Analogizing this case to *In re M.M.* (2015) 236 Cal.App.4th 955 (*M.M.*), father contends the violation of his statutory right to be present was not harmless because, had he been present at the hearing, he could have provided live testimony refuting the Department's evidence in support of the allegations against him. The Department counters father's reliance on *M.M.* "is misplaced[,]" and asserts that on the record in this case, "there is no reasonable probability that [f]ather's appearance . . . would have resulted in the juvenile court dismissing the section 300 petition in its entirety[.]" As discussed below, we agree with father's argument.

In *M.M.*, the mother's arrest for prostitution in May 2014 prompted the Department to file a petition on behalf of her child under section 300, subdivisions (b) and (g). (See *M.M.*, *supra*, 236 Cal.App.4th at pp. 957-958.) The petition alleged the mother took the child with her when she went to solicit sex as a prostitute and failed to make an appropriate plan for the child's ongoing care and supervision while she was incarcerated. (*Ibid.*)

During an interview with the Department, mother admitted she had a history of prostitution but denied soliciting sex on the night she was arrested. (*M.M.*, *supra*, 236 Cal.App.4th at p. 960.) She related that she had gone to a strip club to seek employment, and had left her child in the care of her boyfriend at the time, who was not her pimp. (*Id.* at pp. 959-960.) The mother stated the police officers who reported that her boyfriend had admitted to being her pimp "must have lied[.]" (*Id.* at p. 960.)

At the adjudication hearing, the mother's counsel informed the juvenile court that the mother was not present because she was incarcerated, and objected to the court proceeding in her absence. (*M.M.*, *supra*, 236 Cal.App.4th at p. 960.) The juvenile

10

court overruled the objection, sustained the petition based solely on the evidence submitted by the Department, and removed the child from the mother. (See *id.* at pp. 960-961.)

The Court of Appeal reversed the jurisdictional findings and dispositional order, holding the juvenile court had violated the mother's right to be present for the petition's adjudication under Penal Code section 2625, subdivision (d), and that the error was not harmless. (*M.M.*, *supra*, 236 Cal.App.4th at pp. 961, 964-965.) With respect to latter point, the Court of Appeal rejected the Department's contention that the mother was not prejudiced because her "theory of the case . . . was documented in the Department's reports and argued to the juvenile court by her counsel[,]" and she "d[id] not suggest she could have presented any additional evidence had she been present at the hearing[.]" (*Id.* at p. 963.) In so doing, it explained: "The Department's position ignores the vital role that live testimony plays in a court's assessment of credibility and its evaluation of conflicting evidence: 'Oral testimony of witnesses given in the presence of the trier of fact is valued for its probative worth on the issue of credibility, because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses. [Citation.] A witness's demeanor is "'part of the evidence'" and is "of considerable legal consequence."' [Citation.]" (*Id.* at p. 964.)

The Court of Appeal emphasized that, "[w]ithout hearing directly from [the mother] and assessing her demeanor, the juvenile court rejected her account of the events" leading up to her arrest and found she had placed the child at substantial risk of physical harm by leaving him with her pimp while she solicited for prostitution. (*M.M.*, *supra*, 236 Cal.App.4th at p. 964.) Under those circumstances, the Court of Appeal determined that "if [the

11

mother's] oral testimony were believed, there is no doubt the result of the challenged proceedings would have been more favorable to her." (*Ibid.*) Accordingly, the Court of Appeal stated it "c[ould] not conclude the juvenile court's error in proceeding in violation of [the mother's] right to be present at the hearing was harmless." (*Ibid.*)

Here, as in *M.M.*, the record contains conflicting evidence regarding whether father engaged in conduct placing G.D. at substantial risk of serious physical harm. During an interview with the Department in October 2020, mother stated she and father had been in an on-and-off relationship, and that early on in 2020, she and father "were trying to work things out[ ]" even though she had obtained a restraining order against him several years prior. She reported that in April or May 2020, father spent time with her and G.D. by going to her home, going out to eat together, going to the park, and attending G.D.'s speech therapy services. While mother stated there was no domestic violence during that time, she related father began harassing her in June or July 2020, "when [she] decided to end things with him again" and "get rid of his things that were stored in [her] garage." According to mother, father "started to come around the house and started throwing stuff at the house[.]" She also stated father "broke [a] window" at her home, and that she called the police four times because she "felt threatened" and was "fear[ful] he might do something."

In contrast with mother's statements, during his interview with the Department, father stated he ended his relationship with mother in May 2020 and has not been to her home or visited G.D. since. He reported that prior to his release, his last visit with G.D. was in February 2020. Consistent with these

statements, at the jurisdictional hearing, his counsel asserted "father adamantly maintains that . . . [the] current allegations of domestic violence are not true."

As in *M.M.*, had father been permitted to attend the jurisdictional hearing, he could have testified in person to his version of the events leading up to the referral giving rise to the underlying dependency case. His testimony, if believed, could have influenced the juvenile court's determination whether he had recently engaged in any violent conduct toward mother threatening G.D.'s safety, and therefore whether G.D. was at substantial risk of serious physical harm, given his failure to abide by the restraining order and his history of violence with mother.

Moreover, as father's counsel pointed out at the jurisdictional hearing, the evidence before the juvenile court did not address whether he continued to abuse methamphetamine or any other illicit substances since the prior dependency case was terminated. Nor did the evidence address whether father had been convicted of any drug-related or violent crimes since 2017. Had he attended the jurisdictional hearing, father also could have testified to these issues. His testimony certainly would have been material to the juvenile court's analysis whether his failure to abide by the restraining order exposed G.D. to a substantial risk of serious physical harm due to his substance abuse issues and history of criminal activity.

In determining whether jurisdiction is warranted under section 300, subdivision (b), the question is whether, at the time of the adjudication hearing, a parent's conduct has ""exposed [the child] to a *substantial* risk of *serious physical* harm or illness."' [Citations.]" (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111-112,

13

italics in original.) Accordingly, based on the record in this case and "the vital role that live testimony plays in a court's assessment of credibility and its evaluation of conflicting evidence[ ]" (*M.M.*, *supra*, 236 Cal.App.4th at p. 964), we conclude "it is reasonably probable" father's presence at the jurisdictional hearing would have resulted an outcome "more favorable" to him. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

We also reject the Department's contention that father failed to demonstrate the juvenile court's error was harmless. In support of its position, the Department emphasizes "[f]ather's counsel did not inform the juvenile court that [he] sought to testify at the jurisdictional hearing or indicate what actual testimony [he] sought to provide." Further, the Department argues that father's testimony "was not crucial" to the juvenile court's decision to sustain the petition because, regardless of his testimony, father does not dispute: (1) the juvenile court previously exercised jurisdiction over G.D. under section 300, subdivision (b) based on father's infliction of domestic violence against mother; and (2) father violated the restraining order by going to mother's home and having unrestricted contact with G.D. in 2020.

Both the Department's arguments are without merit. With respect to its first point, the Department does not cite, and we have not located, any authority requiring counsel for an incarcerated parent to represent that the parent seeks to testify at the jurisdictional hearing, or make an offer of proof regarding his or her testimony. Indeed, in *M.M.*, the Court of Appeal held the juvenile court's violation of Penal Code, section 2625, subdivision (d) was not harmless even though, at the adjudication hearing, the mother's counsel did not state the mother wished to

14

testify or provide an offer of proof. (See *M.M.*, *supra*, 236 Cal.App.4th at pp. 960-961, 963-964.)

The Department's second contention is unavailing because it effectively assumes the evidence demonstrating father violated the restraining order by having contact with G.D. outside monitored visitation, coupled with the sustained jurisdictional findings in the prior dependency case that he inflicted domestic violence on mother in 2018, was sufficient to support jurisdiction under section 300, subdivision (b). However, absent evidence suggesting the potential recurrence of a parent's prior harmful behavior, or evidence of recent conduct presenting a risk of physical harm to the child, a parent's violation of a restraining order alone does not justify the assertion of jurisdiction under section 300, subdivision (b). (See *In re Jesus M.*, *supra*, 235 Cal.App.4th at pp. 106, 111-114 [reversing jurisdictional findings under section 300, subdivision (b) where, although father violated a restraining order entered in mother's favor, the record did not reflect any recent incidents of domestic violence or suggest past violence was likely to recur].) This is so because "[d]ependency proceedings are designed not to prosecute a parent or 'for the reproof and improvement of erring parents,' but to protect children. [Citations.]" (*Id.* at p. 113.)

In sum, for the reasons discussed above, we cannot conclude the juvenile court's violation of father's right to be present under Penal Code section 2625, subdivision (d) was harmless. Accordingly, we reverse the jurisdictional and dispositional orders and remand the case to the juvenile court to hold a new adjudication hearing at which father has the opportunity to be present and testify.

15

## II.  Sufficiency of Evidence Supporting Jurisdiction

In addition to arguing the jurisdictional and dispositional orders should be reversed because the juvenile court violated his right to be present under Penal Code section 2625, subdivision (d), father also argues those orders must be reversed because the jurisdictional findings are unsupported by substantial evidence. Having concluded reversal is required based on his first argument (see section I.B, *ante*), we need not address his arguments challenging the sufficiency of the evidence supporting the jurisdictional findings, and therefore decline to do so.

## III.  ICWA

### A.  Governing Legal Principles

"ICWA reflects 'a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimal federal standards that a state court . . . must follow before removing an Indian child from his or her family.' [Citation.] Both ICWA and the Welfare and Institutions Code define an 'Indian child' as 'any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe, or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4); § 224.1, subds. (a) and (b) [incorporating federal definitions].)" (*In re D.F.* (2020) 55 Cal.App.5th 558, 565, fn. omitted (*D.F.*).) ICWA applies "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, [and a] party [is] seeking foster care placement of, or termination of parental rights to, an Indian child . . . ." (25 U.S.C. § 1912(a).)

16

"The juvenile court and [the Department] have an 'affirmative and continuing duty to inquire whether a child for whom a Section 300 petition . . . may be or has been filed, is or may be an Indian child.' [Citations.] This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, *supra*, 55 Cal.App.5th at p. 566.) Only the second and third phases are relevant to this appeal.

The duty of further inquiry "is imposed when [the Department] or the juvenile court has '*reason to believe* that an Indian child is involved' in the proceedings. [Citation.]" (*D.F.*, *supra*, 55 Cal.App.5th at p. 566.) "Further inquiry as to the possible Indian status of the child includes: (1) interviewing the parents and extended family members to gather required information; (2) contacting the Bureau of Indian Affairs and State Department of Social Services for assistance in identifying the tribes in which the child may be a member or eligible for membership in; and (3) contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership or eligibility. [Citations.] Contact with a tribe must include, at a minimum, 'telephone, facsimile, or electronic mail contact to each tribe's designated agent' and include information 'necessary for the tribe to make a membership or eligibility determination.' [Citation.]" (*D.F.*, *supra*, 55 Cal.App.5th at pp. 566-567, fn. and italics omitted.)

The third phase is triggered "once [the Department] or the juvenile court has a *reason to know* an Indian child is involved[ ]" in the dependency proceedings. (*D.F.*, *supra*, 55 Cal.App.5th at p. 568.) "[N]otice pursuant to ICWA must be sent to the pertinent tribe(s) via registered or certified mail. [Citation.] The notice

17

must contain sufficient information to enable the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership.' [Citation.] The required information includes the names, birth dates, birthplaces, and tribal enrollment information of the parents and other direct lineal ancestors of the child, such as grandparents. [Citation.]" (*Ibid.*)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. [Citation.]" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051, fn. omitted.)

### B. Analysis

The parties do not dispute that the Department and the juvenile court satisfied their duty of initial inquiry under ICWA, or that their duty of further inquiry was triggered in this case. Instead, father contends the juvenile court erred by finding the Department satisfied its duties of further inquiry and notice, even though it had yet to receive responses to the ICWA-030 forms from two tribes when the dispositional hearing was held. He also argues the juvenile court erred by "foreclos[ing]" further analysis into whether ICWA applied because G.D. was placed with mother.

As an initial matter, we note the juvenile court's findings regarding ICWA are not entirely clear. At no point in the underlying proceedings did the court *expressly* find ICWA inapplicable. So far as we can tell, however, the record reflects that at the dispositional hearing: (1) the court found the Department satisfied its duties of further inquiry and notice under ICWA and, based thereon, apparently inferred ICWA did

18

not apply; and (2) by declining to hold a status review hearing or order a progress report on pending responses to the ICWA-030 notices sent to Jicarilla Apache Tribe and Navajo Nation, the court effectively found further analysis into ICWA's applicability was unnecessary because G.D. had been placed with a parent. As discussed below, we agree with father and conclude the juvenile court erred by making these findings.

With respect to father's first contention, as noted above, the Department initially sent ICWA-030 notice forms to ten tribes, including Navajo Nation and Jicarilla Apache Nation, on January 8, 2021. After the forms sent to Navajo Nation and Jicarilla Apache Nation were returned to the Department, a social worker contacted representatives from each tribe by phone on March 3, 2021. Subsequently, the social worker emailed a copy of the form to Navajo Nation and resent a physical copy of the form to Jicarilla Apache Nation via mail. Assuming those forms were resent on the same date the social worker spoke to the tribes' representatives by phone,[6] only six days had passed between that date and the date of the dispositional hearing. At that point, the Department had not received confirmation of either forms' receipt, let alone a determinative response from either tribe. On this record, we conclude the juvenile court's finding that the

---

[6] The evidence does not demonstrate when specifically the social worker resent the forms to Navajo Nation and Jicarilla Apache Nation. In the Last Minute Information filed on March 4, 2021, the social worker did not specify the date on which the forms were resent. Moreover, the record does not contain a copy of the e-mail sent to the Navajo Nation representative, nor does it contain any copy of the Certified Mail Receipt for the form resent to Jicarilla Apache Nation.

19

Department satisfied its duties of inquiry and notice, and its finding that ICWA did not apply based on thereon, were premature. (Cf. *In re M.W.* (2020) 49 Cal.App.5th 1034, 1047 [affirming findings that the Department satisfied its duty of inquiry and that ICWA did not apply where "two tribes were given nearly two months within which to provide a determinative response to the Department's ICWA inquiry, a time period [the appellate court] f[ound] reasonable in the context of a dependency proceeding."].)

In considering father's second argument, we find *In re Jennifer A.* (2002) 103 Cal.App.4th 692 instructive. There, the child was living with her mother when a section 300 petition was filed on behalf. (*Id.* at p. 697.) She was detained and placed in an emergency shelter home. (*Id.* at p. 698.) Prior to the dispositional hearing, the social services agency filed a report recommending the child remain in foster home care, with visits by both parents. (*Ibid.*) At the hearing, the juvenile court sustained the petition and placed the child with her father. (*Ibid.*)

On appeal, the mother argued the juvenile court "erred in failing to apply the notice and other procedural requirements of the ICWA." (*In re Jennifer A.*, *supra*, 103 Cal.App.4th at p. 698.) In response, the social services agency argued its failure to comply with ICWA's notice requirements was harmless. (*Id.* at p. 699.) Specifically, it argued ICWA did not apply because, among other reasons, the juvenile court ultimately did not place the child in foster care, and instead placed her with her father. (*Ibid.*)

The Court of Appeal disagreed with the agency, explaining that its "argument ignores the fact that the issue of possible foster placement was squarely before the juvenile court[,]" and improperly "fixate[d] on the result of the proceedings, i.e., the

order that [the child] be placed in the custody of her father, rather than on the possibility that the [juvenile] court could have ordered continued foster home care." (*In re Jennifer A.*, *supra*, 103 Cal.App.4th at p. 700.) Because the child "was temporarily placed in a foster home and [the agency] was seeking to have the temporary placement continue[,]" and the child "had been removed from her custodial parent . . . who could not have [the child] returned to her upon demand[,]" the Court of Appeal concluded the dispositional hearing was an "involuntary proceeding[ ]" within the meaning of Title 25 United States Code section 1912(a), to which ICWA applied. (*Id.* at pp. 700-701.)

Here, as in *In re Jennifer A.*, G.D. was detained from mother, his custodial parent, and placed in foster care with his maternal grandmother pending the petition's adjudication. Mother could not have G.D. returned to her on demand. Subsequently, in each of its reports leading up to the dispositional hearing, the Department consistently recommended that G.D. remain in his foster care placement. At the dispositional hearing, the juvenile court found that although the Department had yet to receive responses to the ICWA-030 forms sent to Navajo Nation and Jicarilla Apache Nation, no further analysis into its compliance with ICWA was needed because G.D. had been placed with mother. In so doing, the court "fixat[ed] on the result of the proceedings, i.e., the order that [G.D.] be placed in the custody of [mother], rather than on the possibility that [it] could have ordered continued foster home care[ ]" to, in effect, conclude ICWA did not apply. (*In re Jennifer A.*, *supra*, 103 Cal.App.4th at p. 700.) This was error. (See *id.* at pp. 700-701.)

In sum, we conclude the juvenile court erred to the extent it found: (1) the Department satisfied its duties of inquiry and

notice and, based thereon, concluded ICWA did not apply; and (2) no further analysis into ICWA's applicability was necessary because G.D. was placed in the home of a parent. Accordingly, those findings are vacated. On remand, the juvenile court should conduct further proceedings as needed to ensure ICWA compliance and ascertain the statute's applicability in this case.

## DISPOSITION

The jurisdictional and dispositional orders are reversed. The juvenile court's ICWA findings are vacated. The case is remanded to the juvenile court for further proceedings consistent with this opinion.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


CURREY, J.


We concur:


MANELLA, P.J.


COLLINS, J.